PATTERSON, Chief Justice,
for the Court:
In the Circuit Court of Coahoma County, Carrie Mae Shedwick was tried on a charge of murder and convicted of manslaughter. The Court sentenced her to serve a term of twelve (12) years in the custody of the Mississippi Department of Corrections with five (5) years suspended.
Shedwick appeals, assigning as error that the trial court:
1. Allowed into evidence a transcript of the tape recorded statement of Shedwick;
2. Overruled Shedwick’s motion to reduce the charge to manslaughter; and
3. Overruled Shedwick’s motion for directed verdict.
The State’s case is based primarily on a statement given by Shedwick shortly before midnight on March 14, 1982, a brief time after Timothy Dukes died of a stab wound to the chest. The defense stipulated the statement was freely and voluntarily given after Shedwick had been advised of her rights. Because there was no other testimony as to the homicide, we refer extensively to appellant’s statement.
The taped recording of the statement was played from the witness stand so it could be heard by the jury. Additionally, the jury was given transcripts of it to aid them in understanding the tape. Later this transcript was admitted into evidence.
Shedwick’s statement, which is often rambling and disjointed, reveals the following facts:
The night of March 14, 1982, Carrie Shedwick and her live-in boyfriend, Timothy Dukes, spent a stormy evening together that was apparently indicative of their three year relationship. Early that night the couple left their home in Friars Point and accompanied some friends and relatives to a cafe called Junior Chase’s Place in Coahoma. While there one of Shed-wick’s former boyfriends made an appearance. This upset Dukes, who was by this time intoxicated. Outside the cafe, Dukes “swung at” Shedwick and put his hands around her neck.
Shedwick and Dukes then drove to B.B.’s Place, in Friars Point. Shedwick remained in the car while Dukes entered the cafe. She stated, “And then he left out and went down the streets. And I went in there to see what my Auntie wanted.” Having remained at B.B.’s approximately ten or fifteen minutes, Shedwick, along with her sister, aunt, and a friend, walked down the street to the Black Cat Inn.
And Timmy walked out the back of the cafe. I didn’t know he was in there. He walked out the back and he slapped me across this side of my face. And I asked him, I said Timmy I said why you slap me. He said cause you think you smart. I said what I did now. I said you always accuse me but you don’t never tell me what I did.
When Shedwick stated she was ready to go home, Dukes “snatched” her off a stool and said “I ain’t taking you no damn where.” He then got into his car and departed.
Fearing that if she went to her own house Dukes would “jump on” her, Shed-wick asked her sister to drive her to her mother’s house.
Upon arriving there Shedwick found the family in bed except for her cousin Mari-lyne Pryor. A short time later Shedwick’s mother came into the kitchen and started a conversation with Shedwick.
*688 She said what’s wrong with you? I said nothing. Said you and Timmy must have been into it. I said yeah. She said well, then, what you crying for? I said nothing. She said did he hit you? I said naw he didn’t hit me. And so then she ask me, she say, well, I, no, she told em. She said I’m going to bed. She said I don’t feel like being upset. She said I hope Timmy don’t come here and start no mess. I said I hope he don’t either.
Shedwick’s mother then returned to her bedroom. While Pryor and Shedwick sat in the kitchen talking, they heard Dukes’ car pulling into the driveway. “I said Marilyne I say give me the knife out the drawer I say in case Timmy want to jump on me. I said cause I’m tired and I can’t take no more.” Shedwick put the knife under her skirt, and Pryor answered the door.
Then when he came in the house, he looked around. He say what’s up Mari-lyne. Marilyne say nothing. He said you think you smart. He said I’m gonna kick your ass like that. He pointed his finger at me. I didn’t say nothing, nothing to him.... All I wanted him to do is not to jump on me. And so by that time he jumped up and he said, well, I’m fixin’ to go. I said well, go ahead on, just leave me alone. And he pushed me. And I took a glass, a glass jar my mama had sitting on the cabinet. I opened the door after he went out and I threw the glass jar at him. It broke on the car-porch. He turned around for to come back in and then I told him, I said Timmy just go ahead on. And he kept pushing me. I said Timmy why don’t you stop? And he kept pushing me. I said Timmy what’s wrong with you? I said who done gave you something like that? • He said I ain’t had nothing. He said I feel good. I said Timmy, I said, what’s wrong with you? What you done had? Who done gave you some, I kept asking him the same thing over and over like that. And he told me he say, bitch, he said I’m gonna kill you. He said I’m gonna be the death of you like that. I said Timmy, I said what have I did to you tonight? He said you ain’t did nothing to me, I just don’t like the way your ex-boyfriend talking about whipping my ass.
Shedwick and Dukes continued their altercation in the carport. At one point Dukes threw Shedwick against the wall and attempted to choke her.
And I asked him, I said Timmy what’s wrong with you? And he kept on saying I’m gonna ... you up. Like that. He kept saying it over and over again. I said Timmy I said I’m tired of you jumping on me. I said you done beated me with boards and did everything you wanted to me. I said what have I did to you? And then he said well, I’m sorry. I won’t do nothing else to you. He said all I want you do is go home with me. And I wasn’t going home with him cause I know if I had went home with him, Timmy would have killed me or half-killed me one. And so what I did, I was going back up in the house and he came, he pushed me into the door.
Dukes again threw Shedwick against the wall and threatened to kill her. “I said Timmy, I said why? and I said I’m tired. And I just went into him, you know, with that knife. I was gonna cut him, you know, like down side here. But then I went into him like this.”
It may be inferred that Marilyne Pryor informed Shedwick’s father, Simmie Smith, that Dukes had been stabbed. Smith and Shedwick rushed Dukes to the hospital, but he died shortly after the wound was inflicted.
Shedwick stated that because she was angry and scared, she had intended to slash Dukes with the knife but not to stab him to death.
Shedwick cites no authority for her first proposition, that the trial court erred in allowing the transcript of the statement to be admitted into evidence. However, she contends the court should find merit in this argument because she was prejudiced by the fact that the jury was allowed to take the transcript into deliberation.
*689 The state argues this assignment is procedurally barred since it is unsupported. Johnson v. State, 154 Miss. 512, 122 So. 529 (1929). However, we dispose of Shed-wick’s proposition by observing the admission of the transcript into evidence probably benefitted Shedwick as much as it prejudiced her in that it contains many references to Dukes’ verbal and physical abuse of her prior .to the stabbing. It also contains Shedwick’s statements that she did not intend to kill Dukes. We are therefore of the opinion this proposition is meritless.
Shedwick next argues the court erroneously overruled her motion to reduce the charge to manslaughter and thereby eliminate the charge of murder from the jury’s deliberation.
We have held many times that “One convicted of manslaughter may not on appeal complain of an instruction dealing with murder, even if erroneous.” Carter v. State, 402 So.2d 817, 819 (Miss.1981); Moss v. State, 386 So.2d 1129 (Miss.1980); Hull v. State, 350 So.2d 60 (Miss.1977). However, we do not reach this line of cases because we are of the opinion there was evidence to support the murder instruction.
Shedwick’s statement reveals Shed-wick threw a jar at Dukes while he was in the carport preparing to leave her mother's house thereby reopening the altercation. Further, Shedwick left Dukes in the carport, returned to the kitchen for the knife, and walked back to the carport where she later stabbed him. Considering these facts, we do not think the trial court committed error in permitting the jury to consider whether Shedwick was guilty of murder.
Finally, Shedwick cites Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933), for the proposition that the trial court erred in overruling her motion for a directed verdict. That case held that,
... where the defendant or the defendant’s witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
165 Miss. at 209, 147 So. at 482.
We find no contradiction of Shedwick’s account of the homicide in terms of testimony by state’s witness, physical facts, or the facts of common knowledge. Rather, the problem lies not so much in determining whether the court should have accepted Shedwick’s version but in ascertaining exactly what that version is. Various portions of Shedwick’s statement convey two different impressions: (1) that she killed Dukes in the heat of a physical battle which made her afraid for her life; and (2) that she stabbed him because she was angry with him and could no longer tolerate his treatment of her in general. Because Shedwick in a sense contradicts herself, we are of the opinion the trial court did not err ■in submitting the case to the jury to allow them to decide the factual issues.
We are of the opinion the record contains no reversible error and the ease should be affirmed.
AFFIRMED.
WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.