## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 95-KA-00670-SCT

*JOHNNY EARL COLEMAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/20/95 |
| TRIAL JUDGE: | HON. JOHN H. WHITFIELD |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | KEITH ROBERTS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOLENE M. LOWRY |
| DISTRICT ATTORNEY: | CONO CARANNA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 6/19/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 7/10/97 |

**BEFORE SULLIVAN, P.J.,McRAE AND MILLS, JJ.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. In the early morning of August 12, 1994, Officers Alan Bond and Steve Patterson of the Biloxi Police Department were on patrol on McDonnell Avenue. They noticed a white truck with a camper over the back parked in the southbound lane with its lights off. As they approached, Johnny Earl Coleman came from behind the truck, got in and started to drive away. The officers pulled him over, and as they got out of the patrol car, Coleman exited the truck and walked toward them. While Officer Patterson spoke with Coleman, Officer Bond approached the truck to check for any unseen suspects inside. When he shined his flashlight through a window in the camper, he discovered a body lying in the bed of the truck. Officer Bond turned back toward Coleman, who was already backing away, and told him to freeze. Coleman took off running, and the officers pursued him into a wooded area, then returned to the truck when they couldn't find Coleman. An eleven-hour search did not reveal the whereabouts of Coleman.

¶2. The body was identified by fingerprints as Sheila Ann Vargas, a known prostitute in the area. A forensic pathologist testified that Vargas had died as a result of strangulation. The drawstring from

her shirt had been wrapped twice around her throat, and there was also evidence of manual strangulation. The autopsy revealed that Vargas had engaged in anal intercourse prior to her death, and when her body was discovered, she was wearing a swimsuit and shorts which were pulled to the side revealing her genital area. In a tape-recorded statement at the Biloxi Police Department, Coleman admitted to paying Vargas for sex on the night of August 11 at around 9:40 p.m., but he denied any involvement in her murder and denied having anal sex with her. Coleman stated that Vargas pulled her swimsuit and shorts to the side to have sex instead of removing her clothes. Coleman testified that on the night of Vargas's death, he left his house in his girlfriend's truck, owned by her father, to get something to eat for himself and his girlfriend. On his way, an unidentified white man darted out in front of the truck, and Coleman hit him. Since Coleman did not have his driver's license with him, he did not want the man to call the police. Coleman stated that the man agreed not to notify the police if Coleman would give him a ride. According to Coleman's version of the story, the man put what he thought was a duffle bag in the back of the truck before getting into the cab. When Coleman dropped the man off by Biloxi High School, Coleman agreed to come back for him on his way back home to drive him somewhere else, so the man left what Coleman thought was his duffle bag in the back of the truck. Coleman testified that he then drove away and had pulled over on the side of McDonnell Avenue to go to the bathroom when the patrol car approached. He stated that he did not know that Vargas's body was in the back of the truck until Officer Bond shined the flashlight into the camper. When he saw her head, Coleman said that he got scared and ran. However, Investigator Larry Murphy with the Biloxi Police Department testified that he believed that Coleman ran, because he knew that the body was in the back of the truck. Murphy stated that Coleman would not have been able to see Vargas's body from where he was standing when Officer Bond discovered the body. Coleman voluntarily surrendered to police the next day and was arrested for murder.

## STATEMENT OF THE LAW

### I.

### WHETHER THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A CONTINUANCE, TESTING OF EVIDENTIAL SAMPLES, AND FUNDS TO PAY FOR SAME?

### Standard of Review

¶3. The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be grounds for reversal unless shown to have resulted in manifest injustice. *Atterberry v. State*, 667 So. 2d 622, 631 (Miss. 1995) (citations omitted).

> The standard of review in Mississippi on this issue is as follows: to reverse, the trial court's denial of expert assistance must be an abuse of discretion 'so egregious as to deny [the defendant] due process and where [the defendant's] trial was thereby rendered fundamentally unfair.' *Fisher v. City of Eupora*, 587 So. 2d 878, 883 (Miss. 1991). *See Johnson v. State*, 529 So. 2d 577, 590 (Miss. 1988). "Undeveloped assertions" that expert assistance will be helpful are insufficient. *Griffin v. State*, 557 So. 2d 542, 550 (Miss. 1990).

*Hunt v. State*, 687 So.2d 1154 (Miss. 1996).

# I.

¶4. Coleman claims that he was misled by the State into believing that they were conducting DNA tests on samples found on and in the victim's anus. During arguments on the defendant's motion for DNA testing on April 14 and motion for a new trial on June 19, Coleman's attorney stated that a detective testified at the preliminary hearing that the State was having DNA testing conducted on semen taken from the victim's body at the Mississippi Crime Lab. The State responded that Coleman could not be misled about DNA testing being done, because the Mississippi Crime Lab has never been qualified to do DNA testing, so the detective must have only been referring to serology testing.

¶5. When Coleman requested a continuance and funds to test the samples himself, the trial judge initially was going to reluctantly grant his motion "to give everybody the benefit of the doubt." However, when the judge informed Coleman's attorney that he refused to count the extensive time required for testing against the State for speedy trial purposes, Coleman's attorney offered the solution of suppressing the State's serology evidence along with the denial of DNA testing, pursuant to the discovery violation remedies set out in *Box v. State*, 437 So. 2d 19, 23-24 (Miss. 1983). The State argues that the trial court properly overruled Coleman's motion for DNA testing in light of the compromise reached by the court at the defense attorney's suggestion. Considering that Coleman's motion was made only five days before the trial, and noting the time and monetary cost involved in DNA testing, the State argues that the trial court correctly overruled Coleman's motion for DNA testing.

¶6. Coleman did not make a motion to have DNA testing conducted until five days before trial. Coleman's attorney claims that he was relying on the detective's testimony from the preliminary hearing that the State would conduct DNA testing. However, there is nothing in the record to support his assertion, because there is not a transcript from the preliminary hearing, and the State denies that their detective misled Coleman.

¶7. In his dissent in *Box*, Justice Robertson set out guidelines for alleviating prejudice resulting from a discovery violation, outlined in U.C.R.C.C.P. 4.06 (i) at the time of Coleman's trial, now incorporated into U.R.C.C.C. 9.04(I). *Box*, 437 So. 2d at 23-24. Rule 4.06(i) and Rule 9.04(I) read in pertinent part as follows:

> If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
>
> (1) Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
>
> (2) If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court should, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
>
> (3) The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.

U.C.R.C.C.P. 4.06(i); U.R.C.C.C. 9.04(I). ***Box*** and Rules 4.06(i) and 9.04 do not apply to this case, because here the State did not withhold evidence, and Coleman's assertion is that the DNA evidence would be exculpatory, not prejudicial. ***See Parker v. State***, 606 So. 2d 1132, 1141 (Miss. 1992). However, in light of the circumstances surrounding the failure to conduct DNA testing in this case, this Court finds that the trial court did not abuse its discretion in deciding to exclude the State's serology evidence instead of granting Coleman a continuance for time to conduct DNA testing. The fact that Coleman's attorney proposed this alternative especially weighs against him on this issue. The trial court's decision, though inappropriately based upon ***Box***, was an equitable compromise and did not result in manifest injustice or render Coleman's trial fundamentally unfair.

¶8. Coleman asserts that the DNA testing would have exonerated him, because the semen was taken from the rectal area, and Coleman denies having had anal intercourse with Vargas. He argues that the autopsy report and the testimony at trial suggested that Vargas engaged in anal intercourse immediately prior to her death, so that if the semen found in her rectum was not Coleman's then he would be exonerated.

¶9. The State responds by arguing that DNA testing would not have been particularly helpful in this case, because there was no way to show that the semen collected belonged to the murderer. Coleman admitted to having sex with the victim on the day of her death, and the victim was a known prostitute. As a result, the State argues, the DNA testing would not add weight to either side's argument, no matter what the results of the DNA tests showed, because the semen could have been Coleman's or anyone else's who had sexual contact with the victim on the night in question.

¶10. Neither the autopsy report nor the serology report were included in the record before this Court. Dr. McGarry, the forensic pathologist who performed the autopsy on Vargas's body, testified on cross-examination by the defense that Vargas had engaged in anal intercourse prior to her death. The State had previously elicited testimony from Dr. McGarry on direct that it appeared from the scrapes and bruises on her body that her arms and hands were pinned beneath her body face down and her chin pushed against a rough surface while her attacker choked her from behind. The doctor did not specifically say that Vargas was engaged in anal intercourse during or immediately before her murder. Statements by the attorneys and trial judge during the pre-trial hearing differed as to whether the semen collected came from rectal swabs and samples or from Vargas's clothing.

¶11. Based upon the limited record before this Court, it does not appear that DNA testing would have been particularly helpful in this case. If the semen sample came from Vargas's clothes, then DNA testing would not help Coleman, because he admitted to having sex with Vargas on the night of her death, and semen on her clothing could have been from vaginal or anal sex. Even if the semen sample were taken from a rectal swab or sample, DNA testing would not exonerate Coleman, because the evidence did not necessarily connect the murder to the anal sex. As a result, Coleman has failed to show that denial of his request for a continuance for DNA testing denied him due process of law under this Court's standards regarding expert assistance. ***See Hunt***, ***supra***.

¶12. The United States Supreme Court in ***Ake v. Oklahoma***, 470 U.S. 68, 77 (1985), set out three factors for determining whether a criminal defendant is entitled to the aid of a psychiatrist as a "basic tool" for his defense.

The first is the private interest that will be affected by the action of the State. The second is the

governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

*Id*. This Court has applied *Ake* to criminal prosecutions involving DNA evidence, requiring that the defendant be provided with an independent expert to analyze DNA evidence presented against him by the State. *Polk v. State*, 612 So. 2d 381, 393-94 (Miss. 1992) . Determination of whether the State must pay for an expert witness for an indigent defendant must be made on a case by case basis. *Davis v. State*, 374 So. 2d 1293, 1297 (Miss. 1979). This Court has previously held that DNA evidence is not always valuable enough to warrant a trial delay. *See Rhymes v. State*, 638 So. 2d 1270, 1274 (Miss. 1994) (holding that trial delay for DNA testing was attributable to the State, but was mere negligence). Tennessee and North Carolina have held that a criminal defendant must show a "particularized necessity" to justify funds for independent DNA experts or analysis. *State v. Edwards*, 868 S.W. 2d 682, 697-98 (Tenn. Crim. App. 1993) (citations omitted); *State v. Mills*, 420 S.E.2d 114, 117-19 (N.C. 1992) (citations omitted). Considering the expense and time required to conduct DNA testing, we will not require the State to pay for DNA testing where there is no showing that would significantly aid the defense.

## II.

### WHETHER THE TRIAL COURT ERRED IN FAILING TO GIVE THE JURY THE DEFENSE INSTRUCTIONS D-2A, D-3, AND D-6?

### Standard of Review

¶13.

This Court's standard of review in reviewing jury instructions is as follows: In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.

*Collins v. State*, 1997 WL 33800 (Miss.) (citing *Hickombotton v. State*, 409 So. 2d 1337, 1339 (Miss. 1982)).

## II.

¶14. Coleman argues that the trial court erroneously refused to grant Instruction D-2A, believing that it was a *Sharplin* instruction and was premature, referring to *Sharplin v. State*, 330 So. 2d 591 (Miss. 1976). A *Sharplin* instruction is one used to encourage further deliberations by a potential hung jury, instructing the jury to reexamine their own views and reconsider if they become convinced that their original opinion was wrong, but not to be swayed merely to reach a verdict. *Id*. at 596. Instruction D-2A read as follows:

The Court charges the jury that it is your sworn duty to vote on each and every ballot of the jury for an acquittal of the Defendant, Johnny Earl Coleman, unless, after conferring with the other jurors, your mind is convinced beyond all reasonable doubt and to a moral certainty and not from any lack of evidence of the guilt of the Defendant. You cannot, under your oath as a

juror, compromise your honest convictions from the evidence, or lack of evidence, as to the guilt or innocence of the Defendant for the purpose of bringing in a verdict. Under your oath and under the law, you should never surrender such conviction simply because every other member of the jury may disagree with you or insist that you yield to save the time of the Court or prevent a mistrial, or shorten the labors of the jury panel, or because of anything or any reason whatsoever, or for any purpose whatsoever. You should vote "Not Guilty" as long as, after a consultation of the evidence, or the lack of evidence in this case, the State has failed to prove Defendant's guilt beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis.

(C.P. 40).

¶15. The *Sharplin* instruction, approved by this Court for hung juries, reads as follows:

I know that it is possible for honest men and women to have honest different opinions about the facts of a case, but, if it is possible to reconcile your differences of opinion and decide this case, then you should do so.

Accordingly, I remind you that the court originally instructed you that the verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another and to deliberate in view of reaching agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous, but do not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Please continue your deliberations.

*Sharplin*, 330 So. 2d at 596.

¶16. Coleman asserts that Instruction D-2A was not a *Sharplin* instruction and therefore should have been granted. The State argues that Instruction D-2A was very similar to the *Sharplin* instruction and therefore premature. Instruction D-2A does have some similar elements to the *Sharplin* instruction. However, jury instructions must be read as a whole, and the trial judge gave satisfactory instructions on the State's burden, reasonable doubt, and the jury's duty in Instructions C-2, C-3, and D-1A. In fact, Instruction C-2 contains similar language to Instruction D-2A, instructing the jury not to "surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict." . "[W]hen instructions are cumulative with others which were granted the trial court is not required to grant several instructions on the same question in different verbiage." *Johnson v. State*, 475 So. 2d 1136, 1148 (Miss. 1985) (citing *Jones v. State*, 381 So. 2d 983, 991 (Miss. 1980)). Taking all of the instructions given in this case together, we find that the denial of Instruction D-2A was not reversible error. *See Collins*, *supra*.

¶17. Coleman also states that Instructions D-3 and D-6 should have been granted instead of the court's general instructions. Without citing any supporting authority, Coleman asserts that a defendant has the right to have his instructions given instead of the trial court's instructions if there is

a significant difference between the instructions.

¶18. Instruction D-3 was properly denied as singling out the testimony of one witness. Instruction D-3 originally read as follows:

> The Court instructs the jury that the law of this State gives the Defendant, Johnny Earl Coleman, the right to testify in his own behalf, and the jury has no right to disbelieve him simply because he is the Defendant. His testimony is entitled to just as much faith and credit as the jury under all circumstances thinks it should have. Furthermore, his testimony is just as entitled to the same consideration as that of any other witness who testified in this case.

It was later amended to read, "The Court instructs the jury that the law of this State gives the Defendant, Johnny Earl Coleman, the right to testify in his own behalf. His testimony is entitled to the same consideration as any other witness who testified in this case." This Court has previously held that "defendants are not entitled to an instruction which informs the jury that the defendant is a competent witness in his own behalf." ***Baker v. State***, 391 So. 2d 1010, 1012 (Miss. 1980). In ***Johnson v. State***, 452 So. 2d 850, 854-55 (Miss. 1984) this Court also held that the defendant was not entitled to an instruction stating "that the Defendant had a right to testify in his own behalf and that his testimony should be treated in the same manner as the testimony of any other witness." ***Id***. (citing ***Baker***, *supra*). The trial judge properly refused Instruction D-3 based upon this Court's prior decisions.

¶19. Instruction D-4 as given served the same purpose as Instruction D-6. Those instructions read as follows:

### Jury Instruction D-4

The Court instructs the jury that where there are two plausible theories, sustained by the evidence, one tending to show the Defendant not guilty, and the other tending to show the Defendant guilty, and the jury is unable to determine which theory is true, it must accept the theory favorable to the Defendant and find the Defendant, Johnny Earl Coleman, "Not Guilty."

### Jury Instruction D-6

The Court instructs the jury that the Defendant is never required to prove his innocence, and in order for him to be acquitted it is not necessary that the jury be satisfied in their minds that he is in fact innocent. Whenever there arises out of the evidence a reasonable probability that he is innocent, then he is entitled to an acquittal. Reasonable probability of innocence is always a reasonable doubt of guilt. In other words, although the theory that he is guilty is more reasonable than the theory that he is innocent, if there arises out of the evidence, and there is supported by the evidence, any reasonable theory under which the Defendant may probably be innocent, he is entitled to be acquitted.

Instruction D-5A as given also instructed the jury on the State's burden in a circumstantial evidence case, stating, "So long as it is reasonably possible or probable to account for the evidence on any reasonable theory or hypothesis consistent with his innocence, the Defendant, Johnny Earl Coleman, must be acquitted, however strongly you believe him to be guilty." Since Instructions D-4 and D-5A

as given, sufficiently instructed the jury on reasonable doubt and the State's burden in a circumstantial evidence case, the trial court properly excluded Instruction D-6 as cumulative. ***See Johnson***, 475 So. 2d at 1148.

## III.

## WHETHER THE TRIAL COURT ERRED IN ALLOWING THE JURY TO READ A TRANSCRIPT OF THE DEFENDANT'S RECORDED STATEMENT OVER THE OBJECTIONS OF THE DEFENSE RATHER THAN SIMPLY ALLOWING THEM TO LISTEN TO THE EVIDENCE?

### Standard of Review

¶20. "A trial judge has broad discretion as to the admissibility of evidence. Unless this discretion is so abused as to be prejudicial to the accused this Court will not reverse the lower court's ruling." ***Dye v. State***, 498 So. 2d 343, 344 (Miss. 1986) (quoting ***Shearer v. State***, 423 So. 2d 824 (Miss.1982)).

## III.

¶21. Coleman next claims that the trial court erroneously allowed the State to give the jury transcripts of Coleman's recorded statement to read along with while listening to the statement. He claims that use of the transcripts was merely unfair bolstering and a violation of Miss. R. Evid. 401 and 403.

¶22. This Court has previously approved the introduction into evidence of a tape recording along with a transcript of an out-of-court statement where the trial judge cautioned the jury that the tape was the primary evidence with the transcript being provided merely for their convenience to follow the tape. ***Dye***, 498 So. 2d at 344. The Fifth Circuit Court of Appeals has also approved this procedure. ***United States v. Onori***, 535 F.2d 938, 946-49 (5th Cir. 1976). Here the trial judge similarly admonished the jury that the transcript was only to be used as a guide, and to pay attention to the tape where the transcript was inaccurate. The transcripts were retrieved from the jury, so that they weren't allowed to review them during deliberations. Under these circumstances, the use of the transcripts was not error.

¶23. This Court has also previously held that no error occurred even when the transcript of a taped statement played at trial was given to jurors to take into deliberations, where the statement benefitted the defendant as well as the State. ***Shedwick v. State***, 453 So. 2d 686, 688-89 (Miss. 1984). Here, Coleman's statement contained his version of what happened on the night in question, in which he claims that he didn't murder Vargas, but that the unidentified white male put her body into the back of the truck Coleman was driving. This story supported Coleman's defense, so under this Court's holding in ***Shedwick***, merely allowing the jury to read along with the transcript while the tape was played was not error.

## IV.

## WHETHER THE TRIAL COURT ERRED IN NOT ARRANGING A FULL VENIRE FOR JURY SELECTION AS ALL POTENTIAL BLACK JURORS WERE EXCUSED OR DISMISSED AND NOT DECLARING A MISTRIAL WHEN A JUROR WAS EXCUSED

**AFTER THE EVIDENCE HAD BEEN CLOSED AND UNDER CIRCUMSTANCES SUGGESTING IMPROPER DISCUSSIONS AND/OR CONTACTS MAY HAVE OCCURRED?**

**Standard of Review**

¶24. On appellate review, the trial court's determinations under *Batson v. Kentucky*, 476 U.S. 79 (1986), are accorded great deference because they are based, in a large part, on credibility. *Lockett v. State*, 517 So. 2d 1346, 1349 (Miss. 1987). "'Great deference' has been defined in the *Batson* context as insulating from appellate reversal any trial findings which are not clearly erroneous." *Id.* at 1349-50 (citations omitted).**IV.**

¶25. Coleman's fourth assignment of error is an assertion of a *Batson* violation. He argues that the race-neutral reasons given by the State for their challenges to black jurors were "mere subtrefuge," (sic) and that the State was attempting to remove jurors of Coleman's race, who might better understand Coleman and his circumstances. Coleman claims that the State's attempt to eliminate black jurors, combined with the lack of a full venire, denied him a fair and impartial trial. The record does not reflect any improper contacts or discussions between jury members or with the attorneys. As a result, that issue is without merit.

¶26. Under *Batson*, a challenge to a peremptory strike necessitates a 3-step process. First, the defendant must establish a prima facie case of purposeful discrimination in the selection of jury members. To do this the defendant must show:

  1. That he is a member of a "cognizable racial group";

  2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race; and

  3. That facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities.

*Conerly v. State*, 544 So. 2d 1370, 1372 (Miss. 1989)(citing *Batson*, 476 U.S. at 96-97; *Lockett*, 517 So. 2d at 1349)).

¶27. Coleman, a black male, is a member of a cognizable racial group. The prosecution used eleven peremptory challenges: seven against white males and four against black females. The result was an all-white jury. Based upon these facts, Coleman established a prima facie case for purposeful discrimination, and the trial judge properly conducted a *Batson* hearing following Coleman's objection.

¶28. Second, should the defendant make such a showing, the striking party then has the burden to state a racially neutral explanation for the challenged strike. *Batson*, 476 U.S. at 97-98. If a racially neutral explanation is offered the defendant can rebut the explanation. *Bush v. State*, 585 So. 2d 1262, 1268 (Miss. 1991) (citation omitted).

¶29. The State made four peremptory challenges against black members of the venire and gave race-

neutral reasons supporting each. The first was Nancy Harville. Ms. Harville had read about the case and discussed it with a co-worker who knew the defendant. She also had blood pressure problems. After the judge denied the State's request to excuse Ms. Harville for cause, they exercised a peremptory challenge to excuse her.

¶30. The State also used a peremptory challenge against Betty Carr. Ms. Carr stated that she knew the defendant's mother from playing cards together. Since Coleman's mother was a potential character witness for the defense, the State decided to strike Ms. Carr.

¶31. Diane Wright stated that she had read about the case and might possibly know Gussie Magee. Gussie Magee was Coleman's girlfriend, and they had a child together. Ms. Magee testified on behalf of the defense. It also turned out that Ms. Wright's deceased husband had an affair with Coleman's aunt. Although the defense initially objected to the State's use of a peremptory challenge against Ms. Wright, Coleman withdrew his objection after finding out about the affair.

¶32. After the jury was selected, but before they were sworn in, Juror Gloria Shabazz came forward and informed the court that she knew Coleman's aunt, Gussie Magee, and their families. Ms. Shabazz operated a florist business through which she became acquainted with them by arranging flowers for weddings and funerals. She was concerned that participating in Coleman's case would negatively affect her business, and she stated that being on the jury would make her uncomfortable. Based upon this new information, the State exercised their final peremptory challenge against Ms. Shabazz, the only remaining black juror.

¶33. Finally, the trial court must make a finding of fact to determine if the defendant has proved purposeful discrimination. *Batson*, 476 U.S. at 98. If the defendant makes no rebuttal the trial judge may base his decision only on the reasons given by the State. *Bush*, 585 So. 2d at 1268 (citation omitted).

¶**34.** Based upon the above race-neutral reasons provided by the State, the trial judge sustained each of the State's strikes and overruled Coleman's *Batson* objection. The court also overruled Coleman's motion for the court to declare a mistrial and bring in a new venire. In light of the jurors' relationships with Coleman and the defense witnesses, we find that the trial judge's findings were not clearly erroneous, and therefore, not reversible error.

V.

**WHETHER THE TRIAL COURT ERRED BY CONSISTENTLY OVERRULING ALL KEY OBJECTIONS OF THE DEFENSE AND SUSTAINING ALL OBJECTIONS OF THE STATE?**

**Standard of Review**

¶35. "A trial judge has broad discretion as to the admissibility of evidence. Unless this discretion is so abused as to be prejudicial to the accused this Court will not reverse the lower court's ruling." *Dye*, 498 So. 2d at 344 (citation omitted).

V.

¶36. It is hard to tell from the brief what exactly Coleman is assigning as error here. He quotes ***Luton v. State***, 287 So. 2d 269, 270 (Miss. 1973), on the requirements to preserve legal points on the admissibility of evidence for appeal, presumably asserting that he has similarly met those requirements. He then states that he bases this assignment of error on the trial court's failure to allow DNA testing and adequate trial preparation.

¶37. The State asserts that they should not have to respond to such a nebulous assignment of error. Their argument is that Coleman has failed to support his assignment with any plausible argument or relevant authority, thereby failing to overcome the presumption that the trial court's rulings were correct. ***Nicolaou v. State***, 612 So. 2d 1080, 1084 (Miss. 1992) (citation omitted); ***Pierre v. State***, 607 So. 2d 43, 48 (Miss. 1992) (citations omitted).

¶**38.** Coleman attempts to generally assign as error every sustained objection by the State and every overruled objection by the defense. There was no apparent error by the trial judge in ruling on objections in this case. This Court need not consider a general assignment of error that does not specifically set out the grounds for objection. ***Dorroh v. Cotten***, 259 So. 2d 121, 123 (Miss. 1972) (citation omitted). Coleman has failed to make any clear argument or cite any meaningful authority to support this assignment of error. As a result, this Court will not consider the issue any further. ***Smith***, 599 So. 2d at 532; ***Montalvo v. Mississippi State Bd. of Medical Licensure***, 671 So. 2d 53, 57 (Miss. 1996) (citations omitted).

## VI.

### WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A NEW TRIAL AS THE CUMULATIVE EFFECT OF ALL THE ERRORS IN THE TRIAL DENIED A FAIR TRIAL TO THE DEFENDANT?

### Standard of Review

¶39. This Court may reverse a conviction and sentence based upon the cumulative effect of errors that independently would not require reversal. ***Jenkins v. State***, 607 So. 2d 1171, 1183-84 (Miss. 1992); ***Hansen v. State***, 592 So. 2d 114, 153 (Miss.1991). However, where "there was no reversible error in any part, so there is no reversible error to the whole." ***McFee v. State***, 511 So. 2d 130, 136 (Miss. 1987).

## VI.

¶40. Coleman argues that even if his assignments of error do not individually constitute reversible error, the combined effect of all of the errors warrants reversal by this Court. The State's position is that no errors occurred in Coleman's trial, so there is no cumulative effect warranting reversal. They assert that Coleman received a fair trial. Since Coleman fails to assert any assignments of error containing actual error on the part of the trial judge in this case, we will should not reverse based upon cumulative error. ***McFee***, 511 So. 2d at 136.

## VII.

### WHETHER THE TRIAL COURT ERRED IN NOT GRANTING A PEREMPTORY INSTRUCTION TO THE JURY OR, IN THE ALTERNATIVE, GRANTING A NEW TRIAL

**AS THE VERDICT OF THE JURY WAS CONTRARY TO LAW AND THE OVERWHELMING WEIGHT OF THE EVIDENCE SO AS TO DEMONSTRATE IMPROPER PASSION AND/OR BIAS ON THE PART OF THE JURY?**

**Standard of Review**

¶41.

> This Court's standards of review regarding a denial of a judgment notwithstanding the verdict and a peremptory instruction are the same. Our standards of review for a denial of a judgment notwithstanding the verdict and a directed verdict are also identical. Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.

*Sperry-New Holland, a Div. of Sperry Corp. v. Prestage*, 617 So. 2d 248, 252 (Miss. 1993) (citations omitted).

¶42. "This Court will reverse a trial judge's denial of a request for new trial only when such denial amounts to a abuse of that judge's discretion. *Shields v. Easterling*, 676 So. 2d 293, 298 (Miss. 1996) (quoting *Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Ass'n.*, 560 So. 2d 129, 132 (Miss. 1989) (citations omitted)).

## VII.

¶43. Coleman asserts that the overwhelming weight of the evidence supported an acquittal in his case. As a result, he argues that the jury's verdict was contrary to law, and the trial court erred in not granting his request for a peremptory instruction or a new trial.

¶44. "To determine whether or not a jury verdict is against the overwhelming weight of the evidence, 'this Court must accept as true the evidence which supports the verdict and will reverse only when it is convinced that the circuit court has abused its discretion in failing to grant a new trial." *Nicolaou*, 612 So. 2d at 1083 (quoting *Thornhill v. State*, 561 So. 2d 1025, 1030 (Miss. 1989). The State points to the testimony of Officer Bond that Sheila Vargas's body was found in the truck that Coleman was driving, and Coleman's own admission to paying Vargas for sex on the day of her death to support their assertion that the jury's verdict was supported by substantial and credible evidence. Coleman's explanation of how Vargas's body ended up in the truck is flimsy at best. Viewing the evidence in the light most favorable to the State, this Court should find that the verdict is supported by the evidence and that the circuit court did not abuse its discretion in refusing to grant Coleman's request for a peremptory instruction or a new trial.

## CONCLUSION

¶45. Coleman's assignments of error regarding the need for DNA testing, refused jury instructions, use of a transcript of an out-of-court statement, a ***Batson*** violation, evidence rulings, cumulative error, and the sufficiency of the evidence are all without merit. Coleman was afforded a fair trial, and the trial judge in this case committed no reversible error in light of the circumstances surrounding his decisions. As a result,we affirm the conviction of murder and affirm the sentence to life imprisonment with the Mississippi Department of Corrections in this case.

¶46. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**LEE, C.J., PRATHER, P.J., PITTMAN, BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**