760 So.2d 33 (2000)
Michael JOHNSON a/k/a Michael Wayne Johnson, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1998-KA-01359-COA.
Court of Appeals of Mississippi.
February 22, 2000.
Rehearing Denied May 16, 2000.
*34 Dwayne G. Deer, McComb, Rebecca G. Taylor, Attorneys for Appellant.
Office of the Attorney General by John R. Henry, Jr., Attorney for Appellee.
BEFORE KING, P.J., DIAZ, AND IRVING, JJ.
DIAZ, J., for the Court:
¶ 1. The Amite County Circuit Court convicted Michael Johnson, a/k/a Michael Wayne Johnson, of the murder of A.J. Carter. On appeal, Johnson contends that the trial court erred in (1) denying his motion for a continuance made in response to the State's alleged failure to disclose exculpatory evidence, and (2) denying his motion to suppress his confession. Johnson also argues that (3) the cumulative effect of the errors denied him a fair trial. We find no error and affirm.

*35 FACTS
¶ 2. Michael Johnson lived and worked with seventy-one year old A.J. Carter, whom he referred to as "Uncle Albert." On Thursday, November 14, 1996, Johnson discovered Carter's body in his Osyka home. Carter had been stabbed to death. Johnson reported this to the victim's brother, and the police were summoned.
¶ 3. When the police arrived, they spoke with Johnson who said he had not seen the victim since the previous Saturday night. Investigators observed footprints near the body; however, Johnson denied approaching the body. Johnson was taken to the police station where he gave a statement denying any culpability in Carter's murder. According to Johnson, he and Carter spent the previous Saturday at the home of Carter's girlfriend in McComb. They left at approximately 3:00 p.m. and went to a local nightclub. Johnson claimed that he last saw Carter alive at approximately 10:00 p.m. when he and his cousin assisted Carter to his car. Johnson stated that Carter drove away alone. After leaving the nightclub, Johnson alleged that he drove to his aunt's home in neighboring Kentwood, Louisiana. He returned to Osyka on Monday and attempted to locate Carter. When he could not find him, Johnson went to the home of Zack Carter, the victim's brother, where he remained until he discovered Carter's body on Thursday.
¶ 4. A.J. Carter's automobile was later found abandoned in Kentwood. Several items of his personal property were recovered from four local residents who purchased them from an individual later identified as Michael Johnson. When confronted with this information, Johnson gave another statement in which he admitted killing Carter. He stated that he and the victim had been drinking all day. At some point, they visited Carter's girlfriend and continued drinking until approximately 4:00 p.m. Carter and Johnson then went to a local bar where Johnson purchased a pint of "cheap whiskey." Johnson drove Carter home and when they arrived, Johnson claims that Carter "started talking about my family saying that they didn't want me. I grabbed the butcher knife from the top of the heater and stabbed him a bunch of time[s]." Johnson stated he took Carter's wallet and moved his body so that it would not be visible through the cracks in the walls of the home. Johnson drove to another nightclub where he met an acquaintance, later identified as Anita Brumfield, a/k/a Nett Holden. There, Johnson purchased one hundred dollars worth of crack cocaine. He and Brumfield left the nightclub and picked up two other individuals. The group departed, in search of individuals to whom they could sell Carter's chainsaws and shotgun. Johnson ran out of gas near the home of Vera Nichols. According to Johnson, he left to get gas and when he returned, a deal had been struck whereby Nichols agreed to purchase one of the chainsaws for twenty dollars. Johnson used part of the proceeds to purchase gas and the remainder to purchase another rock of cocaine. Throughout the evening and early morning hours, Johnson sold the victim's other chainsaw, his shotgun, and his radio, using the proceeds to purchase crack cocaine. He later abandoned the car and threw the keys in a ditch. Johnson then walked to his aunt's home where he remained until Monday.
¶ 5. Johnson was indicted for the murder of A.J. Carter. Following a trial held in the Amite County Circuit Court, Johnson was convicted and sentenced to a term of life in the custody of the Mississippi Department of Corrections.

DISCUSSION

I. WHETHER THE TRIAL COURT ERRED IN DENYING JOHNSON'S MOTION FOR A CONTINUANCE TO REMEDY DISCOVERY VIOLATIONS COMMITTED BY THE STATE
*36 ¶ 6. On the day of trial, a hearing was held on several discovery violations alleged by Johnson. According to Johnson's attorneys, they had received several documents just three days before trial. Among the documents was a report from the Mississippi Crime Lab which contained a notation that the victim was "last seen in Summit around 1:00 p.m. by his daughter Mable Randle...." An arrow was drawn from this notation to another which reads "last seen Sunday in Summit." The defense sought a continuance, alleging that this evidence changed the time of death from late Saturday or early Sunday to sometime after 1:00 p.m. on Sunday. Johnson's attorneys contended that although they were already presenting an alibi defense, had they known of this witness, they would have been able to account for a greater portion of Johnson's time from Sunday afternoon until he discovered the body on Thursday. In an effort to cure the alleged violation, the trial court allowed a copy of the report to be placed into evidence. The court reasoned that the "[o]nly prejudice to the defendant would have been the ability to know of this witness, to go out and secure this witness; so that's what the Court is considering doing to provide this piece of evidence for the defendant the same as if they had not been prejudiced and assuming that this witness would have come in and made that statement under oath in Court."
¶ 7. URCCC 9.04(A)(6) provides that
[T]he prosecution must disclose to each defendant or to defendant's attorney, and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request and without the necessity of court order the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution: ... (6) Any exculpatory material concerning the defendant.
¶ 8. In Box v. State, the Mississippi Supreme Court set forth the following procedures for trial courts to follow when faced with a discovery violation: 1) Upon defense objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc. 2) If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue. 3) If the defendant does request a continuance, the State may choose to proceed with trial and forego using the undisclosed evidence. If the State is not willing to proceed without the evidence, the trial court must grant the requested continuance. Box v. State, 437 So.2d 19, 23-24 (Miss.1983) (Robertson, J., specially concurring). These guidelines are now codified in URCCC 9.04(I), formerly URCCP 4.06(i).
¶ 9. The Box analysis only applies when the State withholds inculpatory evidence and then attempts to introduce that inculpatory evidence at trial. In the instant case, the State did not attempt to use the evidence which it failed to disclose to Johnson. At the hearing on Johnson's motion for a continuance, the State explained "we did not subpoena Mable Randall; I don't even know who that is, Your Honor." Moreover, the evidence is exculpatory rather than prejudicial. In Parker v. State, the defendant contended that the State withheld DNA evidence which tended to exculpate him. Parker v. State, 606 So.2d 1132, 1141 (Miss.1992). The supreme court held that "Box simply does not apply to this case.... The newly discovered evidence was not prejudicial to the defense but was instead beneficial." Id. Similarly, in Coleman v. State, the court found that failure to turn over exculpatory evidence did not trigger the Box analysis because "Coleman's assertion is that the DNA evidence would be exculpatory, not prejudicial." Coleman v. State, *37 697 So.2d 777, 781 (Miss.1997). Accordingly, we find that review under Box was not mandated.
¶ 10. We further find that the trial court's remedy for the violation was sufficient. It is difficult to find any prejudice suffered by Johnson as a result of the tardy disclosure of the report. At the hearing on Johnson's motion for a continuance, his attorneys maintained that they would be presenting an alibi defense. Accordingly, they should have already procured witnesses who could account for Johnson's whereabouts from Saturday night, when the State alleged the murder was committed, until the following Thursday when Johnson discovered Carter's body. The fact that Carter's daughter allegedly saw him that Sunday should have no impact on Johnson's alibi defense.
¶ 11. Moreover, it is unclear whether the notation truly stated that Mable Randle had seen her father on that particular Sunday. The report contains many handwritten notes, one of which reads "last seen in Summit around 1:00 p.m. by his daughter, Mable Randle...." An arrow is drawn from this notation to another which reads "last seen Sunday in Summit." No date is given. Any uncertainties surrounding the notation were resolved in Johnson's favor. The trial court's decision accommodated Johnson and did not result in manifest injustice or render his trial fundamentally unfair. "The grant or denial of a continuance lies within the sound discretion of the trial court." Walker v. State, 729 So.2d 197 (¶ 4) (Miss.1998). The trial judge did not abuse his discretion in denying Johnson's motion for a continuance.

II. WHETHER THE TRIAL COURT ERRED IN FAILING TO SUPPRESS JOHNSON'S CONFESSION
¶ 12. Johnson contends that his confession was involuntarily given. He alleges that his mild mental retardation prevented him from knowingly, intelligently, and voluntarily waiving his Miranda rights. Moreover, Johnson claims that he believed he was confessing to the theft of the victim's personal property, not to his murder.
¶ 13. There is no per se rule that mental retardation renders a confession involuntary and inadmissible. Neal v. State, 451 So.2d 743, 756 (Miss.1984). The mental abilities of an accused are but one factor to consider among the totality of the circumstances of a confession and interrogation. Id. A trial judge must "determine whether the accused, prior to the confession, understood (a) the content and substance of the Miranda warnings and (b) the nature of the charges of which he was accused." Blue v. State, 674 So.2d 1184, 1205 (Miss.1996).
¶ 14. Officers Allen Applewhite and Bill Vallely testified that Johnson understood his rights, was neither coerced nor threatened to give a confession, and appeared to understand what was happening. The officers further stated that no threats, promises of leniency, or coercion were used in procuring Johnson's confession. Apple-white denied that he suggested to Johnson what he should say. He stated that when the recovered items of property were presented to Johnson, he "broke down and told us the facts that led to the death of A.J. Carter." Johnson's sister, Sandra Johnson, testified on her brother's behalf. She stated that her brother was in special education classes from the first grade through the fifth or sixth grade when he quit school. Ms. Johnson further testified as to her brother's inability to read.
¶ 15. The supreme court has upheld trial courts' findings that a mentally impaired defendant waived his Miranda rights knowingly, intelligently, and voluntarily where the fact of the defendant's impairment was known to the court. Neal v. State, 451 So.2d at 743 (defendant with IQ of fifty-four and organic brain dysfunction nevertheless lawfully waived Miranda rights); Veal v. State, 585 So.2d 693, 697 (Miss.1991) (mildly mentally retarded defendant who can read and write and appeared *38 to all witnesses to the interrogation to have understood the process held to have voluntarily, intelligently and knowingly waived Miranda rights); Smith v. State, 534 So.2d 194, 196-97 (Miss.1988) (defendant with IQ of sixty-five who was unable to read, could not recognize the word "waiver," could not understand multisyllabic words, and had only the minimal skills necessary for daily functioning waived Miranda rights).
¶ 16. The determination of the voluntariness of a confession is essentially a fact-finding function. So long as the court applies the correct legal standards, this Court will not overturn a finding of fact made by a trial judge unless it be clearly erroneous. Therefore, the determination of the trial judge must necessarily be given great weight. Greenlee v. State, 725 So.2d 816 (¶ 32) (Miss.1998). We find that the trial court's determination regarding the admissibility of Johnson's statement was not manifestly in error.

III. WHETHER THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED JOHNSON OF A FAIR TRIAL
¶ 17. Johnson argues that even if his assignments of error do not individually constitute reversible error, the combined effect of all of the errors warrants reversal by this Court. However, where "there was no reversible error in any part, so there is no reversible error to the whole." McFee v. State, 511 So.2d 130, 136 (Miss.1987). Because we find no merit in any of Johnson's assignments of error, we will not reverse his conviction based upon cumulative error.
¶ 18. THE JUDGMENT OF THE AMITE COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS AN HABITUAL OFFENDER IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO AMITE COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR.