790 So.2d 201 (2001)
Floyd WARE, Jr., Appellant
v.
STATE of Mississippi, Appellee.
No. 1999-KA-01122-COA.
Court of Appeals of Mississippi.
February 27, 2001.
Rehearing Denied April 17, 2001.
Certiorari Denied July 19, 2001.
*203 Jerry L. Bustin, Forest, Attorney for Appellant.
Office of the Attorney General by John R. Henry Jr., Booneville, Attorney for Appellee.
Before SOUTHWICK, P.J., IRVING, and MYERS, JJ.
IRVING, J., for the Court:
¶ 1. Floyd Ware, Jr. appeals his conviction of DUI manslaughter and makes ten assignments of error which we recast for clarity and resolution. His assignments of error are a bit convoluted and contain several sub-issues which are not neatly woven together, but as best as we can tell it appears he complains of (1) the improper admission of gruesome photographs of the victims, (2) the improper admission of testimony from an accident reconstructionist, (3) collusion between the trial court and the prosecution in failing to disclose the non-availability of a blood sample taken from Ware which was analyzed for alcohol by the State and destroyed prior to Ware's indictment, (4) the failure of the trial court to properly instruct the jury and the denial of certain defense instructions, (5) the denial of an adequate suppression hearing because of confusion by a second judge as to what had transpired while the case was being handled by the first judge, (6) the sentence of twenty years with five suspended, on the basis that such sentence is tantamount to a life sentence because of his age and health, (7) the failure of the trial court to grant a new trial because of cumulative acts of misconduct on the part of the prosecutor, (8) the failure to grant a new trial because (a) one juror failed to respond during voir dire to a defense question regarding convictions about the use of alcohol, and (b) another juror testified in a post-trial motion hearing that she and other jurors wanted an answer to a question sent to the trial judge concerning the date of the destruction of the blood sample, (9) the use of a jury selection panel containing only three African Americans when more representative panels were available and the striking of those three by the prosecution, *204 and (10) the trial judge's ordering open-ended restitution, denying bail pending appeal and placing Ware under house arrest.
¶ 2. We find no reversible error. Accordingly, we affirm Ware's conviction and sentence.

FACTS
¶ 3. The charge for which Ware was convicted arose out of a vehicular accident on May 17, 1998, in rural Scott County. Ware, John T. Graffenread, and Curtis Stowers were riding along Ringgold Road in Ware's pickup with Ware at the controls. Attached to the pickup was a trailer carrying three horses which the men had been riding earlier in the day.
¶ 4. As Ware approached the intersection of Ringgold Road and Highway 21, he failed to stop at a posted stop sign and proceeded through the intersection at about thirty miles per hour. A 1972 International Scout, traveling north on Highway 21, was approaching the intersection at the same time. Tommie Ferguson was driving the Scout which belonged to Glenda Sawyer, one of the passengers in the Scout. Glenda's husband, Tommy, was also a passenger in the Scout. All three of the Scout's occupants were seated in the front. When the two vehicles collided, Tommy and Glenda Sawyer were ejected from the Scout to their deaths.
¶ 5. Initially, Graffenread told investigators from the highway patrol that he was the driver of the pickup truck; consequently, he was taken to a local hospital for the purpose of giving a blood sample. While at the hospital, Graffenread changed his story and told the highway patrol officer that Ware had been driving the pickup truck at the time of the collision.
¶ 6. When Ware was confronted with Graffenread's turnabout, Ware admitted that indeed he had been driving the pickup truck. Ware then consented to giving a blood sample. The sample was drawn about two hours after the accident. It was kept in Patrolman James's home refrigerator for four days before being taken to the crime laboratory in Meridian on May 21, 1998. Patrolman James gave conflicting testimony about whether he thought Ware was drunk at the time Ware gave the blood sample. Patrolman James first said he thought Ware was drunk, that Ware smelled of alcohol and that his speech was slurred. After being pressed for an explanation as to why he did not arrest Ware, James then said he did not think Ware was drunk. Later in his testimony, he changed that assertion and said he believed Ware was drunk. Ware's blood sample was analyzed on June 3, 1998, and according to the forensic toxicologist who did the analysis, it revealed a blood alcohol content level of .16. Ware was not arrested and charged until October 13, 1998. The remaining portion of Ware's blood sample was destroyed by the State before Ware was indicted in February 1999.
¶ 7. A blood sample was also drawn from Ferguson. Like the sample drawn from Ware, this sample also was kept in Patrolman James's refrigerator before being transported to the crime laboratory. This sample also was analyzed on June 3, 1998, and according to the forensic toxicologist who performed the analysis, it was negative for alcohol. The remaining portion of Ferguson's blood sample was retained, but as stated, the remaining portion of Ware's sample was destroyed. The State's explanation for treating the two samples differently was that Ferguson's sample was retained for further testing for drugs. The crime lab employee who did the analysis testified that the crime lab was not aware that the samples were involved in a court case and that Ware's sample was destroyed *205 after six months because the lab treated it simply as a traffic related matter.
¶ 8. The packaging containing the samples for both Ware and Ferguson had been opened and resealed in the Meridian crime laboratory before they were received and analyzed in the Jackson laboratory. The forensic toxicologist who analyzed the samples said that it was standard procedure for the Meridian laboratory to open evidence packages as a part of its inventory process. No explanation was offered as to why the samples were not analyzed in Meridian or why they were taken there in the first place if they were not, or could not, be analyzed there.
¶ 9. Highway Patrol Investigator James testified that, when he questioned Ware at the hospital concerning how the accident occurred, Ware stated that as he approached the intersection he looked up, saw that it was too late to stop, and proceeded through the intersection in hopes that there would not be any traffic. At trial, Ware gave a different version in which he claimed that he prepared to stop in time and applied the brakes but that the weight and momentum of the trailer and horses carried the pickup truck into the intersection.
¶ 10. With regard to his alcohol consumption, Ware testified on direct examination that he had not consumed any alcohol on the day of the accident and denied that he was drunk. On cross-examination, however, he admitted that he may have had one beer during the course of the day, but maintained his position that he was not drunk. When pressed to explain how he could register .16 blood alcohol content, Ware explained that heavy drinking the night before the accident and the single beer he may have drunk before the horse ride could provide the explanation. However, he steadfastly denied that he was drunk. Ware also testified that he had not been told of his blood alcohol content level until he was arrested in October.
¶ 11. Graffenread testified that he did not see Ware drink any alcohol during the horse ride but admitted that he and Ware were not together the entire time; therefore, he could not say for certain that Ware had not been drinking. Graffenread also testified that Ware did not appear to be drunk at any time during the day. Graffenread further testified that he did not tell Patrolman James that Graffenread was driving the pickup. He testified that Patrolman James assumed as much, and at that point, he did not tell him anything different.
¶ 12. Another witness who had been at the horse riding also testified that he did not see Ware drink any alcohol and that Ware did not appear to be drunk, yet he also was unable to say for certain that Ware had not been drinking because he had not been with Ware the entire day. A mechanic called by Ware testified on direct examination that the brakes on Ware's pick-up were not sufficient to stop the pick-up while pulling a trailer carrying three horses. On cross-examination, the mechanic explained, however, that his testimony was only meant to apply in a "sudden stop" situation. The mechanic went on to explain that if the driver had notice of an upcoming stop and slowed the pickup in preparation for the stop, then the brakes were sufficient to stop the vehicle.

ANALYSIS OF ISSUES PRESENTED

1. Admission of Photographs of the Victims
¶ 13. Ware argues that the introduction of accident scene photographs of the victims was error because (1) the fact that death occurred as a result of the accident had been stipulated; (2) all of the *206 other physical elements of the accident scene had been introduced by photographs; therefore, there was no need to show the bodies and (3) the bodies were particularly mangled, bloody, and gruesome, and the photographs had no probative value, serving only to prejudice the jury.
¶ 14. This Court will not reverse a trial court's decision to allow the admission of photographs into evidence absent an abuse of discretion by the trial court. Holland v. State, 705 So.2d 307, 350 (Miss. 1997) (citing Givens v. State, 618 So.2d 1313, 1317 (Miss.1993)). The trial court judge found that the photographs were gruesome but held that they were admissible under the circumstances because the jury was entitled to know the facts surrounding the collision and its effect on the victims. The judge determined that the photographs were probative in this regard and would assist the jury in understanding these things. We do not find that the photographs had any probative value on the ultimate issue before the jury. However, we also conclude that their admission did not result in any prejudice to Ware as we do not find them particularly gruesome. We, therefore, hold that there was no abuse of discretion on the part of the trial court in the admission of the photographs.

2. Testimony and Sketch of the Point of Impact of the Two Vehicles
¶ 15. Highway Patrolman James was one of the state troopers who investigated the accident. As part of his investigation, James prepared a sketch of the accident scene. Among other things, the sketch depicted what Patrolman James determined to be the point of impact of the two vehicles. Officer James was not qualified or accepted as an expert in accident reconstruction, and there is no indication in the record that he was qualified by either experience or training as such. He had been a highway patrolman about three years, and there is some indication in the record that he had investigated other accidents at this same intersection. However, there is no evidence in the record of the number of prior accidents that Patrolman James had investigated.
¶ 16. Over Ware's objection, the sketch was admitted into evidence. The record reflects the following:
BY MR. DUNCAN: Your Honor, I'd offer this sketch as an exhibit, please.
BY THE COURT: Mr. Bustin, have you seen it?
BY MR. BUSTIN: The onlyI think I've been shown a copy, but the only thing that I have a question about is whether he shows the point of impact on that, which is it possible for him to know, if he didn't see it. I think he could draw a scene, and he could draw where the results of the vehicles were found, and the bodies were found, but I don't know how in the world he knows where the point of impact was without being there. So I would object to the drawing for the purpose of that.
BY THE COURT: All right. The objection is overruled, given the prior testimony of the officer as far as his involvement as the investigative officer. Let it be marked.
¶ 17. Ware cites Gandy v. State, 355 So.2d 1096 (Miss.1978) and Rule 701 of Mississippi Rules of Evidence for the proposition that the sketch was improperly admitted. We will discuss Gandy later in this opinion, but for the moment, we turn our attention to M.R.E. 701 which states, "If a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based *207 on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue." M.R.E. 701. Since Patrolman James was not an expert in accident reconstruction, he could not give testimony about the point of impact for an accident he did not see, but he could testify to what he found and observed at the scene of the accident upon his arrival.
¶ 18. However, there is not any testimony in the record from Patrolman James which sheds any light on why he placed the point of impact where he did. For example, there is not any evidence concerning debris or skid marks. The vehicles were not in the road and had traveled post-impact beyond the point of impact. If Patrolman James could not give oral testimony as to the point of impact, he clearly could not do so by way of a diagram that he drew. If he had observed debris or other indicators of an impact, he could have placed those items on the diagram, but the diagram contains no such items. We hold that since Patrolman James was a lay witness testifying within the ambit of M.R.E., it was error for the trial court to admit the diagram showing the point of impact.
¶ 19. Gandy, a decision rendered prior to the enactment of Mississippi Rules of Evidence, involved a fact situation wherein Gandy was driving his Pontiac automobile south on Highway 25 about four miles south of Starkville. David Palmer and two female companions were traveling north on Highway 25 in Palmer's Toyota automobile. The vehicles collided head-on. Palmer and the passengers in his car, all students at Mississippi State University, were killed. Gandy, the only witness to the collision, was not seriously injured. Gandy, 355 So.2d at 1098.
¶ 20. Highway Patrolman Pearson, one of the investigating officers, made a hand-drawn sketch of the accident scene which showed the two automobiles in the northbound lane with the front of each automobile touching the other. Id. at 1099. Pearson testified at trial that the sketch was intended to identify the accident scene and show the position of the automobiles at the time of the accident. An objection was made to the introduction of the sketch. The objection was overruled. Id.
¶ 21. On appeal, the Mississippi Supreme Court held that an investigating officer may give testimony about personal observations made regarding (1) the position of the vehicles, (2) marks on the highway, and (3) the position of any debris, glass and dirt. Id. at 1100. The court held, however, that it was the province of the jury to determine from those physical facts the point of impact and how the collision occurred. Id. The court went on to hold that the officer may not testify to the point of impact of the two vehicles or give his opinion as to the position of the vehicles at the time of the collision, as such testimony is speculative. Id. (citing Carruth v. Griffis, 220 Miss. 541, 71 So.2d 478 (1954)). At trial, Officer Pearson had been asked on direct examination to give his opinion on where the collision had occurred. Without objection, and on cross-examination Pearson was asked to give his opinion on the location of the collision approximately five times. The Mississippi Supreme Court held that, "[t]hat testimony and the sketch would constitute reversible error, had objection been made and preserved properly." Gandy, 355 So.2d at 1100.
¶ 22. In light of the Mississippi Supreme Court's ruling in Hollingsworth v. Bovaird Supply Co., 465 So.2d 311 (Miss. 1985), discussed in the paragraphs that follow, Gandy is good law only to the extent that its holding would apply to the opinion testimony of persons, including police *208 officers, who are not qualified by training, education, and experience to give an expert opinion as an accident reconstructionist. Thus, if this case involved only the testimony of Patrolman James, we could end our inquiry here. However, the State offered the testimony of James Cain, an expert in accident reconstruction, who was qualified as such in this case before giving testimony. We will discuss his testimony later.
¶ 23. When Gandy was handed down, Mississippi did not recognize the science of accident reconstruction and disallowed the opinion testimony of persons purporting to be experts in accident reconstruction. All of that changed when the Mississippi Supreme Court decided Hollingsworth. Hollingsworth mandated that persons qualified by experience or training in accident reconstruction could qualify as experts in the field and give testimony just as any other expert in his chosen discipline. Hollingsworth, 465 So.2d at 314-15.
¶ 24. Later, in Miller by Miller v. Stiglet, Inc., 523 So.2d 55, 60 (1988), the Mississippi Supreme Court removed any question which may have lingered regarding whether the expert opinion testimony of a police officer concerning an accident is admissible to the same extent as the expert opinion of any other accident reconstructionist not in law enforcement. Having laid the parameters for consideration of this issue, we turn now to the testimony of Officer James Cain.
¶ 25. As stated, Officer Cain, an accident reconstructionist for the Mississippi Highway Patrol, was qualified and accepted as an expert witness. It appears from the record that Officer Cain was called not to establish the point of impact, but to establish that Ferguson did not have sufficient time to react so as to avoid the accident. This point is buttressed by the following testimony given by Officer Cain:
Based on my time-distance analysis, if the Chevrolet pickup driven by Mr. Ware had stopped at the stop bar, the white painted stop bar at the intersection of Ringgold and Highway 21, and based on a standard acceleration rate, which has been determined through field trials and by research by myself, and documented research by other reconstructionists, it would have taken him 2.6 seconds to reach the area of impact where it occurred. Based on this and the fact that, if the Scout was traveling at the stated speed of fifty miles an hour, he would have been some 201 feet from the area of impact. The standard perception reaction time that's been accepted nationwide is a second and a half. At this distance and that perception reaction time, Mr. Ferguson, you know, would have been able to decelerate his vehicle, or take some type of evasive action
* * * *
Assuming that Mr. Ware did not stop, and there was no evidence to indicate any braking there, and based on statements that were given to the investigating officer that he did go through the stop sign, at his speed of thirty miles an hour, he'd only been one-half of a second from impact, and this would put Mr. Ferguson only thirty-six feet away, which would have given him no time at all to react.
(emphasis added).
¶ 26. Noticeably absent from the record is any evidence as to the exact distance or point from the intersection where the drivers, Ferguson and Ware, first observed each other. Ferguson testified that he was driving approximately fifty miles per hour as he approached the fatal intersection. He then explained what happened:

*209 I was just northbound, and there was just a set of lights came from the right, came through the stop sign and just hit us in the right side.
* * * *
All I saw was just the headlights, and I never saw the vehicle.
* * * *
I didn't have time [to avoid the accident]. It was just amaybe a reflex. I remember maybe seeing the lights, and maybe grabbing the wheel, but it was just a split second. I didn't have time to change lanes or anything.
Ware described what happened this way:
I was rolling along about thirty miles an hour, and I looked out there and there was the intersection. I put on my brakes, and they didn't respond. I guess the weight carried me on out in the road.
* * * *
I know I hit a car .... or something. I know that.
¶ 27. We note that in order for Officer Cain to conclude that Ferguson had no time to avoid the accident, Cain would have to know not only the speed of the two vehicles but both the point of impact and Ferguson's specific position when he first saw Ware's truck. Nothing in this record indicates that he had knowledge or Ferguson's specific position or that his knowledge of the point of impact was independently acquired. Ferguson did not say how far he was from the intersection or, if in the intersection, at what position, when he first saw the car lights approaching from the right.
¶ 28. Officer Cain went to the scene of the accident the day following the accident. As to his observations, this was his testimony:
Preliminary observations indicated a scuff mark, a tire mark, near the center-line of Highway 21 north. There were some other tire marks leading off toward the final rest of the two vehicles, which had already been moved. There was orange paint at the scene where Trooper James had marked the final rest of the two vehicles, as required by policy.
* * * *
That was basically the evidence.
* * * *
Officer Cain gave further testimony which reveals the crux of the problem. Here is what he said:

Based on information that I had at that time as far as to the direction of travel of the vehicles, and what the initial investigating officer had concluded transpired, the damage indicated that it was consistent with what everybody had told him and the way the accident had occurred as far as direction of travel of the vehicles. No crush deformation was done on these, but the damage appeared to be consistent with the speed statements that he had been given.
(emphasis added).
¶ 29. Cain did not offer any testimony that the "area of impact" used in calculating the time-distance analysis was based on anything other than the area of impact as indicated on Officer James's sketch. Cain made no independent personal determination of the point of impact. Cain did observe "a scuff mark, a tire mark, near the centerline of Highway 21 north" and "other tire marks leading off toward the final rest of the two vehicles." However, Cain offered no testimony as to the freshness or age of the scuff or tire mark or its location other than it was "near the center-line of Highway 21 North." There was no evidence of debris or skid marks.
*210 ¶ 30. Ware made a timely objection to the admission of Cain's testimony, but his objection was overruled. We conclude that Cain's testimony was properly admitted because, as a properly qualified expert in accident reconstruction, he could give his opinion regarding the accident. But we also conclude that his testimony did not cure the error and prejudice caused by the admission of the diagram showing the point of impact as determined by Patrolman James. We arrive at this conclusion because it is clear from Officer Cain's testimony that he accepted the point of impact as determined by Patrolman James rather than making an independent determination.
¶ 31. Further, from our review of the evidence, it is difficult for us to see, on the evidence presented, how Officer Cain could have either independently determined the point of impact or, using information provided by Patrolman James, confirmed the point of impact as determined by James. Neither officer testified about debris or other indicia of a point of impact. It does not appear that any skid marks were left by either vehicle. This is not to say that the point of impact could not have been ascertained. We simply hold, on the facts of this case, Officer Cain did not make that determination.
¶ 32. In summary, we hold that a law enforcement officer may, with proper training and experience, qualify as an expert accident reconstructionist. Nothing in this record indicates that Patrolman James could have qualified if the attempt had been made. Even though Officer Cain was qualified and accepted as an expert in accident reconstruction, it is clear that he did not make any independent assessment of the point of impact. We see no reason why Officer Cain could not use factual information supplied to him by Patrolman James in making his own independent determinations. However, here, the only person to make the assessment about the point of impact was Officer James.
¶ 33. We have already found that it was error for the trial court to admit the diagram. We now hold that the error committed in admitting the diagram through the testimony of Patrolman James was not cured by virtue of Officer's Cain's testimony. We must now determine whether admission of the diagram showing the point of impact is reversible error. We conclude that it is not. We arrive at this decision because there is a plethora of other evidence from which the jury could conclude that Ware was negligent and that his negligence caused the accident. For example, it is undisputed that Ware ran the stop sign and that Ferguson had the right-of-way when Ware plowed into the side of the Scout. It is also not disputed that Ferguson was northbound and in the proper lane of travel for northbound traffic when the accident occurred. If the evidence was such that, without the evidence concerning the point of impact, the jury could not conclude whether Ferguson or Ware was responsible for the accident, then admission of the improper testimony concerning the point of impact would, in our opinion, constitute reversible error. It is quite clear from the evidence, however, that the accident was caused by Ware's running the stop sign.
¶ 34. No construction of the evidence supports the conclusion that Ferguson could have been responsible for the accident. There is, however, evidence from which the jury might properly have concluded that Ferguson was negligent. That evidence is Ferguson's testimony that he did not see the truck at all, that he only saw lights coming from the right, but that he did not see the lights in time to do anything to avoid the accident, not even in time to change lanes. It seems to us that *211 this testimony indicates a failure to maintain a proper lookout. The fact that Ferguson had the right-of-way did not excuse him from the obligation to maintain a proper lookout for traffic which might traverse his path. Surely, if he had been maintaining a proper lookout, he would have seen the headlights on Ware's truck before arriving at the intersection. A review of the pictures of the accident scene reveal no obstructions to Ferguson's view of the intersection. Having determined that there was at least some evidence which could have led the jury to conclude that Ferguson was also negligent, the question remains whether any negligence on the part of Ferguson would be a defense to the charges against Ware.
¶ 35. In this prosecution for DUI homicide, the State was required to prove the following elements: (1) Ware was under the influence of intoxicating liquor or had.10 percent or more of alcohol in his blood while operating a motor vehicle, (2) Ware was, while intoxicated and operating a motor vehicle, negligent and (3) Ware's negligence caused the death of Glenda and Tommy Sawyer. Holloman v. State, 656 So.2d 1134, 1142 (Miss.1995). Ware's action must be found to be the proximate cause of the deaths. On our facts, we believe the evidence, excluding the evidence regarding the point of impact, is sufficient for the jury to have concluded that Ware's action was the proximate cause of the accident notwithstanding the existence of any negligence on the part of Ferguson.

3. Destruction of the Blood Sample
¶ 36. Ware contends that the state crime lab's action in discarding the unused portion of his blood sample before he could have an independent analysis done constituted a clear case of prosecutorial misconduct to gain a tactical advantage.
¶ 37. Before addressing Ware's contention, we believe it is appropriate to address the issue of the constitutionality of drawing the blood sample since the Mississippi Supreme Court, subsequent to the filing of the briefs in this case, has held that Miss. Code Ann. § 63-11-8 (Rev.1996) is unconstitutional. McDuff v. State, 763 So.2d 850 (¶ 16) (Miss.2000). The blood drawn in this case was drawn pursuant to the authority of this code section which mandates that blood be taken from any driver involved in a fatal accident regardless of probable cause.
¶ 38. Ware sought to suppress the result of the blood analysis on four grounds: (1) lack of probable cause to take the blood sample, (2) a claim that the procedure in taking the blood sample was not properly administered, (3) a claim that the test was not timely and (4) a claim that the blood sample was not taken or sent to the crime laboratory in a timely manner. While Ware did not specifically raise the constitutionality of the statute by nomenclature, his assertion, that the State lacked probable cause to draw the blood, sufficiently raised the issue to implicate the constitutional prohibition against search and seizure without probable cause.
¶ 39. As stated, Ware was not arrested until October for the accident which occurred in May. Patrolman James stated that he "could tell they had been drinking." However, Ware did come to the hospital a couple hours following the accident and confessed that he was the driver of the pickup. At that time the blood sample was drawn. If Patrolman James believed Ware was intoxicated at that time, it is a mystery to us as to why he would not have either questioned Ware about whether Ware had drunk any alcoholic beverages since the accident or just simply arrested him on the assumption that Ware's intoxicated state existed at the *212 time of the accident. After all, Patrolman James testified that he observed an apparent odor of intoxicating beverage on Ware while at the scene of the accident.
¶ 40. When Ware objected to the admission of the blood analysis result, the trial court issued the following ruling:
All right. The statute controlling the matter is Section 63-11-8 of the Mississippi Code, and it's very clear as to the duties of an arresting officer at the time of investigation of an accident resulting in death. That's the title of the section. The Court has heard testimony of Officer James, and it appears from the testimony that there is abundant information underabundant testimony, rather, in evidence under the statute that I just quoted to show probable cause.
* * * *
The general definition of what probable cause is, is what an officer, in this case, Officer James, would do as a trained officer, as a reasonable person, given the totality of the circumstances, and they are very present. He received the call at approximately nine o'clock. He got there twenty-seven minutes later. He saw thirty or more people there, some intoxicated, the two vehicles, and there's the testimony about first thinking it was Mr. Graffenread who was the driver, and then, further investigation focused on Mr. Ware. There's no question but what the officer had probable cause.
¶ 41. While the trial judge concluded that probable cause existed for the drawing of the blood, it is not debatable, as shown from the quote above, that he did not specifically discuss Ware in the process. Nevertheless, we are bound to accept his finding of probable cause unless we are able to conclude he abused his discretion. Based on the totality of the circumstances, we cannot so conclude. Since the trial judge found probable cause for the drawing of the blood, we conclude that the result of the blood analysis could be properly admitted notwithstanding the holding in McDuff.
¶ 42. Ware also argues that the trial court and the prosecution knew when he was indicted that the remaining portion of the blood sample had been destroyed and that the failure to inform him of the destruction was by design for the purpose of obtaining his assent to continuances under the mistaken notion that such was needed in order for him to procure an independent blood analysis. He also seems to argue, without citing any facts, that the continuances somehow prejudiced his case. Citing the fact that one term of court passed without indictment after the State had the result of the blood analysis, Ware contends that the prosecution intentionally did not indict him until after the sample had been destroyed to give the State a tactical advantage.
¶ 43. As stated, the crime lab scientist testified that the unused portion of the sample given by Ware was destroyed by the lab six months after it completed its test in accordance with its standard procedure. Ware has not offered any evidence that the remaining portion of the sample was intentionally destroyed to prevent him from obtaining an independent analysis.
¶ 44. It seems to us that the State's failure to preserve the remaining portion of the blood sample is inexcusable. This is especially true in light of the fact that the State preserved the remaining portion of Ferguson's blood sample. We are mindful of the State's explanation, but it is puzzling as to why two different samples, submitted to the crime lab at the same time and arising out of the same accident, would be treated so differently. Nevertheless, we cannot conclude on this record that the State's failure to preserve Ware's sample *213 was, as Ware contends, for the purpose of denying Ware an opportunity to have an independent analysis done. Indeed, there is no evidence that the analysis performed by the State crime laboratory was not trustworthy, nor is there any evidence, or reason to suspect, that an independent analysis would have arrived at a different result. Consequently, there is no reason to suspect that the remaining portion of the sample would be exculpatory in nature. In other words, this is not a Trombetta[1] situation.

4. Jury Instructions
¶ 45. "In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." Coleman v. State, 697 So.2d 777, 782 (Miss. 1997) (quoting Collins v. State, 691 So.2d 918 (Miss.1997)). Ware launches an attack on several jury instructions that were given to the jury. We will discuss some of those instructions individually and others that are similar in nature will be discussed as a group.
¶ 46. Ware cites error in the giving of Instruction 10 but he did not brief or argue the issue. Issues which are unsupported by authorities and not argued are abandoned and need not be considered. Pate v. State, 419 So.2d 1324, 1325-26 (Miss.1982).
¶ 47. Jury instructions 12, 16, 17 and 18 all deal with the issue of proximate cause and are combined for purposes of this discussion. Ware alleges that these instructions were offered to explain proximate cause and were wrongfully refused by the trial court. He contends that the State failed to instruct on anything other than simple negligence and offered no instruction on proximate cause. When these instructions were offered by Ware, the State argued that they were the same type of instructions offered but denied by the trial court in Wilkerson v. State, 731 So.2d 1173 (Miss.1999), and that the Mississippi Supreme Court, on appeal, had approved the trial court's decision to deny the instructions. The trial court basically agreed with the State, and the instructions were refused. The instructions are as follows:
Instruction 12
The Court instructs the jury that an element or test of proximate cause is that an ordinarily prudent man should have reasonably foreseen that some injury might probably occur as a result of this negligence. It is not necessary to foresee the particular injury, the particular manner of the injury or the extent of the injury. In order to be a proximate cause, the negligence of Defendant must be a substantial factor in producing the victim's death. If the victim would have been injured even if the Defendant had not been negligent, the Defendant's negligence is not a substantial factor and not a proximate cause.
Instruction 16
The Court instructs the jury that the Defendant may not be found guilty of DUI Homicide unless they find that said Defendant operated a vehicle within this state (a) under the influence of intoxicating liquor which impaired his ability to operate a motor vehicle; or (c) with ten one hundredths percent (.10%) or more by weight volume of alcohol in his blood *214 based upon milligrams of alcohol per one hundred (100) cubic centimeters of blood as shown by chemical analysis of such person's breath, blood or urine; and unless such impairment proximately caused his negligence which was the proximate cause of death.
Instruction 17
The Court instructs the jury that, unless the State proves beyond a reasonable doubt, the Defendant's negligence, and that intoxication was the proximate cause of the negligence which resulted in the death, you must find the Defendant not guilty.
Instruction 18
The Court instructs the jury that accidents may happen with all parties negligent, part of the parties negligent or none of the parties negligent and before you can find the Defendant guilty of DUI Homicide you must find his negligence was the proximate cause of the deaths of the parties.
The instruction in Wilkerson was as follows:
Instruction D-4
Negligence is the failure to use reasonable care. Reasonable care is that degree of which a reasonably careful person would use under like or similar circumstances. Negligence may consist either of doing something that a reasonably careful person would not do under similar circumstances, or of failing to do something that a reasonably careful person would do under like or similar circumstances.
You are instructed that the Defendant is not liable for all injuries that flow from his negligence, but only for those that could have been reasonably foreseen and anticipated. The injuries suffered by victim must result from a chain of a natural and unbroken sequence from Defendant's negligent act. However, the Defendant is not liable for damages which are remote or collateral, or which result from a remote, improbable or extraordinary occurrence, although such occurrence is within the range of possibilities flowing from Defendant's negligent act.
An element, or test, of proximate cause is that an ordinarily prudent man should reasonably have foreseen that some injury might probably occur as a result of this negligence. It is not necessary to foresee the particular injury, the particular manner of the injury, or the extent of the injury. In order to be a proximate cause, the negligence of Defendant must be a substantial factor in producing the victim's death. If the victim would have been injured even if the Defendant had not been negligent, the Defendant's negligence is not a substantial factor and not a proximate cause.
Wilkerson v. State, 731 So.2d at 1180.
¶ 48. The Wilkerson court ruled that the first portion of Instruction D-4 was identical to Instruction 9 which was given by the trial court and that the last portion of Instruction D-4 spoke to the issue of proximate cause. The Wilkerson court held that no other instruction spoke to the issue of proximate cause and that Wilkerson was entitled to an instruction on proximate cause but that the trial court did not commit reversible error in refusing the instruction because (a) the proffered instruction was abstract and confusing, (b) defense counsel made no specific reference to proximate cause, and (c) defense counsel did not attack the State's instructions for the absence of a requirement that proximate cause be found. Id. The Wilkerson court then surmised that defense counsel's failure to raise the issue of proximate cause may have been due to the fact that the defendant had essentially conceded that the victim died as a result of the *215 accident and that the accident was caused by the defendant's negligence. Id. at 1180-81. Given those facts, the Wilkerson court concluded that the only issue to be resolved was whether there was proof beyond a reasonable doubt that the defendant was operating a vehicle in violation of the drunk driving statute and that the instructions that had been given clearly required the jury to find that the defendant negligently caused the victim's death. Id. at 1181.
¶ 49. On the basis of this holding in Wilkerson, we find that Ware was entitled to an instruction on proximate cause and that no instruction on proximate cause was given by the trial court. We further find, however, that the failure to give the instructions on proximate cause proffered by Ware did not constitute reversible error for two reasons, (1) the instructions did not correctly state the law and were abstract and confusing, and (2) the trial court gave Instruction S-1 which we believe safeguarded against Ware being found guilty in the absence of a finding that his actions proximately caused the accident and the Sawyers's death.
¶ 50. Instruction S-1 told the jury that it could convict Ware if it believed from the evidence beyond a reasonable doubt that "Floyd Ware, Jr., did willfully, unlawfully, and feloniously operate a motor vehicle while under the influence of intoxicating liquor, having ten one-hundredths percent (.10%) or more by weight volume of alcohol in his blood, and in a negligent manner caused the death of Tommy E. Sawyer and Glenda F. Sawyer." While the instruction did not tell the jury to find Ware not guilty if it believed the evidence did not show those things, it is reasonable and logical to assume that the jury understood that it had the obligation to return a not guilty verdict if it did not believe the proof sufficient to warrant a finding as to each of the elements contained in Instruction S-1.
¶ 51. Ware claims error in the lower court's refusal to grant contributory negligence instructions 15 and 19. It is Ware's contention that the lack of seat belts in the Scout contributed to the death of the Sawyers in that they would not have been ejected to their death had they been strapped into seat belts. This issue, however, was not briefed and no support was cited or argued; therefore, it is unsupported and abandoned and need not be considered. Pate v. State, 419 So.2d 1324, 1325-26 (Miss.1982). Moreover, it appears to us, given the elements of the charge, that negligence on the part of the Sawyers would not be a defense to the charge unless their negligence was the sole cause of their deaths.
¶ 52. Ware claims error in the refusal of his proffered jury instruction 20 which reads as follows:
The Court instructs the jury that if you find the Defendant operated a motor vehicle with ten one-hundredths percent (.10%) or more by weight volume of alcohol in his blood based upon milligrams of alcohol per one hundred (100) cubic centimeters of blood as shown by chemical analysis of such person's breath, blood or urine but that such impairment did not cause the negligence that resulted in the deaths then you may find the Defendant guilty of DUI First Offense and not guilty of DUI Homicide.
This instruction would have required the State to prove that any negligence was the consequence of alcohol consumption and failing that, allowed the jury to find a lesser offense of DUI first offense rather than DUI homicide. Ware contends that this case is controlled by Cutshall v. State, 191 Miss. 764, 772, 4 So.2d 289, 292 (1941), which holds that "in order for the influence *216 of intoxicating liquors to be a factor in showing criminally culpable negligence it must contribute proximately both to the establishment of such negligence and to the resultant death." Cutshall was a case brought under Miss.Code Ann. Section 97-3-47 (Rev.1994), the culpable negligence manslaughter statute, while the case against Ware was brought under Miss. Code Ann. 63-11-30(5), which contains no requirement that the negligence has to be caused by the alcohol.
¶ 53. Ware cites several decisions of the Mississippi Supreme Court and this Court which he claims required evidence of culpable negligence under Section 63-11-30(5). A careful review of those authorities fails to yield any support for this contention. The Mississippi Supreme Court has said that simple negligence is sufficient for a conviction under Miss.Code Ann. § 63-11-30(5) (Supp.2000). See Holloman v. State, 656 So.2d 1134, 1140 (Miss. 1995). The Holloman court also said that only simple negligence is required by the statute, not culpable or gross negligence. Id.

5. The Jury Selection Process
¶ 54. Ware claims that the trial judge manipulated the opportunity for blacks to serve on the jury by starting the jury selection process with panels which had fewer blacks on them than on other panels. He also says in his brief that the State struck three black jurors, and that this amounts to a Batson[2] violation.
¶ 55. We have examined the record and find these charges to be without merit. First, when the issue was raised by Ware, the trial judge stated that the court rotated the juries and that the court had used panels three, four and five to select the jury for the case tried the previous day. So far as we can tell, Ware makes no allegation regarding the selection of the panels. For example, he does not contend that the jurors on the panels were not randomly selected or that some other impermissible act occurred in the selection process.
¶ 56. While the record is not entirely clear, it appears to us that jury selection started with panel number seven, which had two jurors on it, instead of panel number six which apparently had twelve jurors on it. No explanation was given for starting with panel number seven, if indeed that is what was done, instead of panel number six. We point out that once jurors have been randomly selected and assigned to panels, we can see no good reason for not taking those panels in numerical order. We assume the jurors were assigned to the panels as they were drawn. In any event, the record reflects that panel number seven only had two jurors on it, and the race of those two jurors is not shown in the record. Further, Ware made no Batson challenge during the jury selection process.

6. The Failure of the Trial Court to Grant a New Trial
¶ 57. The motion for a new trial is addressed to the sound discretion of the trial judge, and we will not reverse the trial judge's decision absent a finding of abuse of that discretion. Quinn v. State, 479 So.2d 706, 709-710 (Miss.1985). Ware asserts that he should have been granted a new trial for two principal reasons, (1) various improper comments by the prosecution, and (2) the alleged failure of a juror to respond truthfully during voir dire to a defense question regarding convictions held by jurors concerning the use of alcohol. *217 Additionally, Ware argues that the jury pool was tainted somehow by the refusal of the trial court to answer some questions sent out by the jury after it had retired to deliberate. The jury made inquiry as to (a) the date when Ware became aware of the charges, (b) the time span between the date of the awareness of the charges and the date when Ware contacted a lawyer, and (c) the date the blood was thrown away. The trial judge declined to answer the jury's questions and told them to continue their deliberations, following the written instructions already given them.
¶ 58. These are the comments about which Ware complains:
(1) We shouldn't bend the rule, so to speak, you know, and break the rules for the State of Mississippi just to give Mr. Ware a fair trial, (2) you have heard our [burden] of proof is beyond a reasonable doubt, and I'm sure Mr. Turner mentioned that to you yesterday. It's not something higher or lower than that, (3) that he ought to buy his way out of this charge, (4) that's Mr. Bustin's wishful thinking; that you'll somehow turn his-he'll make this emotional argument to you and that you'll turn his client loose; but I want [sic], (5) you know people make choices everyday. I make them; you make them; sometimes, we make good ones, and sometimes we make bad ones, but whatever the choices we make, you've got to live with them, (6) I've done all I can do to make him accountable. So has everybody else that I know of, and now we're going to hand it over to you, and that is all I ask you to do, and (7) so simply, just go do your duty and hold him responsible for his own choices, the choices that Tommy Sawyer and Glenda Sawyer had to pay for, and now that he, also, should have to pay for.
¶ 59. We have reviewed, in context, the prosecutor's comments about which Ware complains and find Ware's assertion of error to be without foundation. We also have reviewed the voir dire and the testimony adduced in the post-trial hearing on the claim of impropriety in the failure of a juror to respond truthfully to defense counsel's questions. We likewise find this claim, as well as the claim regarding the failure of the trial court to further instruct, to be groundless. Consequently, we can find no abuse of discretion on the part of the trial judge in denying Ware's motion for a new trial.

7. The Sentence and Restitution
¶ 60. Ware, relying upon Lee v. State, 322 So.2d 751 (Miss.1975), argues that he was improperly sentenced because his sentence of twenty years with five years suspended is tantamount to a life sentence, a sentence which is prohibited by Lee. Additionally, Ware's counsel makes reference to an "Order Accepting Guilty Plea and Imposing Sentence" which is also contained in the record. It appears that the order relates to the same charges which were the subject of the jury verdict. Counsel asserts that he had no knowledge of this separate order until the record was being prepared for this appeal. We will return to the matter of this order later in this opinion.
¶ 61. Ware's reliance upon Lee is misplaced. In Lee, the appellant was convicted of forcible rape under Mississippi Code Annotated Section 973-65 (Rev.2000) which carries a penalty of life imprisonment "if the jury by its verdict so prescribes." The jury did not affix the penalty at life imprisonment, but the trial judge sentenced Lee to life imprisonment. On appeal, the Mississippi Supreme Court held that "[t]he statute presupposes, absent a jury recommendation of life imprisonment, that the judge will sentence the defendant to a definite term reasonably *218 expected to be less than life." Id. at 753. Ware was sentenced less than what is permitted by the statute for vehicular homicide. If the sentence meted out to a defendant does not exceed the statutory limitation, no violation occurs. This assignment of error is without merit.
¶ 62. Ware cites no authority for his assertion that the restitution ordered in this case is improper; therefore, we will not address that issue. As stated, Ware mentions an "Order Accepting Guilty Plea and Imposing Sentence" which he claims to have no knowledge. We note that the order purports to be signed by Circuit Judge Vernon Cotton and purports to be recorded in Minute Book 50 at pages 50-59. We have not been enlightened by Ware as to the meaning of this order, nor is it the subject of any of the assigned errors. Consequently, we do not address it in this opinion.
¶ 63. We affirm the trial court in all particulars in this case.
¶ 64. THE JUDGMENT OF THE CIRCUIT COURT OF SCOTT COUNTY OF CONVICTION OF DUI MANSLAUGHTER AND SENTENCE TO SERVE TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIFTEEN YEARS TO SERVE AND THE REMAINING FIVE YEARS SUSPENDED, AND FIVE YEARS PROBATION AND RESTITUTION OF $23,270.49 IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., PAYNE, BRIDGES, THOMAS, LEE, MYERS AND CHANDLER, JJ., CONCUR.
NOTES
[1] California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Under the holding in Trombetta, the State has a duty to preserve evidence that might be expected to play a significant role in a defendant's defense.
[2] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Batson holds that jurors cannot be prevented from serving simply because of their race.