# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00774-COA

**CLEMELL BOGAN, JR.** APPELLANT

**v.**

**STATE OF MISSISSIPPI** APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/31/2024 |
| TRIAL JUDGE: | HON. CAROL L. WHITE-RICHARD |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COUNTY |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JULIANNE KAY BAILEY |
| DISTRICT ATTORNEY | W. DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; REMANDED IN PART - 05/12/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND McDONALD, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1. Clemell Bogan Jr. was convicted of first-degree murder and aggravated assault in the shooting death of Michael Harvey. During voir dire, the prosecution raised a "reverse" *Batson* challenge, arguing that the defense improperly struck 4 of 5 white venire members. On appeal, Bogan argues that the trial court failed to follow the required three-prong analysis as prescribed by *Batson v. Kentucky*, 476 U.S. 79 (1986). We agree, and consistent with *Miles v. State*, 346 So. 3d 840 (Miss. 2022), we remand for the trial court to conduct a limited *Batson* hearing.

**FACTS AND PROCEEDINGS**

¶2. Michael Harvey was shot and killed on Hutson Street in Leland in March 2020. Harvey's cousin Justin Lattimore was with him at the time of the shooting and later identified photographs of Bogan and Monterrious Smith as the two individuals involved in the shooting. A nearby police officer heard the gunshots and observed two young males running away. The officer apprehended Bogan, who had a firearm tucked in his waistband. Smith was apprehended at a later time. Both Bogan and Smith were charged with first-degree murder and attempted murder. However, Smith died before the case came to trial.

¶3. During jury selection, the court asked the members of the venire if any of them were coworkers. Sixteen potential jurors indicated that they had coworkers in the jury pool. The court had the members identify their coworkers, describe their working relationships, and in particular, state whether one worker had a supervisory authority over the other. Juror Numbers 4 and 32 indicated that they both worked at Mississippi State University. Neither operated in a supervisory capacity over the other. When asked, "Is there anything about the fact that the two of you are coworkers that would cause us – that we should have any concern about?" Juror Number 4 responded "no." When asked separately, "[W]ould we receive an independent verdict from you?" they each responded "yes."

¶4. The members of the venire were asked: "Is there anyone here who yourself, a family member, a significant other, close friend have been prosecuted for a felony charge here in Washington County?" Juror Number 6 responded. His now ex-wife had served a year for possession twelve years previously. When asked, "Is there anything about having a former

2

or ex-wife go through the experience that would cause you to lean one or another in this case?" he responded "no" and indicated that he could set that aside and judge this case on its own.

¶5.    After the defense exercised some but not all of its peremptory strikes and the venire was tendered to the State, the State raised a *Batson* challenge. The State noted that of five white potential jurors tendered to the defense, the defense struck four. The court found that a prima facie case of racial discrimination had been raised and asked the defense to provide race-neutral reasons for each strike.

¶6.    For strike one (Juror Number 4), the defense stated that "when both attorneys were voir diring, this gentleman did not appear to be engaged at all, and so that was the reason why I exercised D-1 for him."

¶7.    For strike two (Juror Number 6), the defense stated:

> Juror No. 6 indicated that, I believe, his – what he characterized as his ex-wife had a prior criminal history.
>
> He indicated that – well, he did indicate that he didn't think that his wife had been treated unfairly, but I got the impression that he may have almost been happy that his wife got prosecuted.
>
> And so because of that, I had a concern as to whether or not he would be more – would tend to lean more favorable to the State as opposed to being fair and impartial.

¶8.    For strike three (Juror Number 24), the defense stated that "Juror Number 24 didn't appear to be responsive to either the Court, the State, nor defense counsel; so he just appeared – that juror just appeared to be withdrawn from the process." For strike four (Juror Number 32), the defense stated:

Juror No. 32 and Juror No. 4, they work together. Juror No. 4 was the first strike that I exercised. I got the impression that their relationship may have been a little bit more than what was communicated to the Court, and because they did indicate that they work together, that is why I exercised [the strike].

¶9.     After hearing the race-neutral reasons offered by the defense, the trial court stated:

COURT:     Okay. Considering those reasons collectively for each of the strikes as to Juror No. 4, D-1, did not appear to be engaged; Juror No. 6 appeared to be happy that his wife was prosecuted; D-3, Juror No. 24 didn't appear to be responsive, appeared withdrawn from the process; and D-5, appeared that the relationship may have been a little bit more than what was communicated with the Court between Juror No. 4 and Juror No. 32 – the Court does not find those reasons to be – I think they are pretextual.

Juror No. 4 did not appear not to be engaged. He listened to the questions. He responded, I presume like the rest of the jurors, when there was something that he wanted to respond to, what he felt applied to him. Juror No. 4 is put on the jury. He will be added to the jury.

The Court will give you D-2, which was Juror No. 6. I won't add [him].

¶10.     The court ultimately added Jurors Numbers 4, 24, and 32 to the jury. The court permitted the defense to keep its strike of Juror Number 6.

¶11.     Harvey's girlfriend Rosaundra Grisby testified. Grisby is a lifelong resident of Leland. She had known Harvey for three years and had been dating him for two. Monterrious Smith and Bogan were also long-time residents of Leland, and Grisby knew them. She testified that Smith and Bogan had a long-time "beef" with Harvey and that they did not get along. Two days before the shooting, Bogan sped down Hutson Street while Grisby and Harvey were outside. She swore an exclamation because of how fast Bogan was driving, not realizing that

he would hear her. Bogan stopped his car, and Harvey told Bogan not to talk to Grisby. On the day Harvey was killed, Grisby observed Smith and Bogan together as she walked from her house on Hutson Street to nearby McCray's Grocery to buy a drink. While she was inside of the store, she heard several gunshots. The store owner shouted and told her, "[Y]our old man got shot." She ran down the street to discover Harvey non-responsive and bleeding from his head. As she ran, she observed Smith running away.

¶12.    Harvey's cousin Justin Lattimore, who was sixteen years old at the time of the shooting, testified at trial. On the day of the shooting, Lattimore and Harvey were walking back toward Grisby's house after visiting the apartment of Lattimore's grandmother. Two males crossed the street and approached them. Lattimore knew of Bogan but did not personally know Smith or Bogan. As the two pairs passed each other, Smith raised his shirt, showing the top of a firearm.[1] Harvey grabbed Lattimore, indicating to speed up, and Lattimore heard two gunshots. Harvey and Lattimore then began running, with the other two men running parallel to them in the same direction one street over. As they approached the house on Hutson Street, Lattimore heard a third gunshot, which struck and killed Harvey. Lattimore did not observe who fired that shot.

¶13.    P.K. Nelson, who was the Leland Police Chief at the time of the incident, testified. Nelson was at a gas station a few blocks from Hutson Street when he heard gunshots. He drove toward the sound of the gunshots and observed two young men running away. He followed them and apprehended Bogan. He removed Bogan's gun and secured Bogan in the

---

[1] Lattimore later identified Smith and Bogan from a photographic line-up.

back of his car before driving to Hutson Street.

¶14. Charles Dones testified. At the time of the incident, Dones was captain and chief investigator for the Leland Police Department. When Dones arrived at the scene, he took custody of Bogan from Chief Nelson as well as custody of Bogan's gun. Dones identified the gun as a black .40-caliber Smith and Wesson. The gun had "fourteen plus one" capacity, and it had six live rounds in the chamber when taken into evidence. Dones took photographs of the crime scene, but he was not able to locate any shell casings. He did not return to the crime scene after this initial visit. Dones also took Bogan's phone into evidence. Photographs recovered from Bogan's cell phone showed Bogan posing with a firearm, which Dones identified as looking similar to the firearm recovered. Dones administered a gun residue test to Bogan and submitted the kit to the State forensics lab for testing.

¶15. The State's expert medical examiner testified that Harvey died from a gunshot wound to the head, with the bullet entering through the left forehead. The shot was a distance shot taken from more than three feet away. The State's forensics expert testified that Bogan's right hand and the top of his left hand tested positive for trace amounts of gunshot residue.

¶16. The jury found Bogan guilty of first-degree murder and aggravated assault. Bogan now appeals.

**STANDARD OF REVIEW**

¶17. While our appellate courts apply a highly deferential standard of review over a trial court's *Batson* rulings, "to reach [a *Batson*] finding, the trial judge must conduct a proper *Batson* analysis." *Miles*, 346 So. 3d at 842 (¶5). "We apply de novo review to a challenge to

6

the sufficiency of the evidence." *Tubwell v. State*, 359 So. 3d 249, 250 (¶5) (Miss. Ct. App. 2023) (citing *Sims v. State*, 329 So. 3d 528, 534 (¶20) (Miss. Ct. App. 2021)).

## DISCUSSION

### I. Whether the trial court failed to conduct an adequate *Batson* inquiry.

¶18. Bogan argues that the trial court failed to conduct the correct inquiry and analysis following the State's reverse-*Batson* challenge. "*Batson* established a three-part burden shifting scheme for assessing whether a challenged peremptory strike was discriminatory[.]" *Miles*, 346 So. 3d at 842 (¶4). The analysis consists of the following steps:

> First, the party objecting to the use of a peremptory strike has the burden to make a prima facie case that race was the criterion for the strike. Second, if the objecting party makes such a showing, the burden shifts to the striking party to state a race-neutral reason for the strike. Third, after the striking party offers its race-neutral explanation, the court must determine if the objecting party met its burden to prove purposeful discrimination in the exercise of the peremptory strike—that the stated reason for the strike was merely a pretext for discrimination.

*Id.* (quoting *H.A.S. Elec. Contractors Inc. v. Hemphill Constr. Co.*, 232 So. 3d 117, 123 (Miss. 2016)).

¶19. In *Miles*, the State raised a *Batson* challenge after the defense exercised peremptory strikes against seven white members of the venire. *Miles*, 346 So. 3d at 842 (¶6). After making a finding that a prima facie case of discrimination had been made, the court asked the defense to provide race-neutral reasons for each strike. *Id.* For four of the seven potential jurors, the court accepted the race-neutral reasons. *Id.* However, the "trial court found that Miles's reasons for striking prospective jurors 23 and 32 were not race neutral, and then,

7

without asking whether the State had any argument regarding pretext, the trial court placed those two individuals on the jury panel." *Id.* This was problematic because "the trial court did not afford the State an opportunity to rebut Miles's race-neutral reasons for the strikes of prospective jurors 23 and 32. Nor had the trial court asked the State for any rebuttal that it might have had for Miles's race-neutral reasons concerning the four prospective jurors that he was allowed to strike." *Id.*

¶20.    The *Batson* procedure in *Miles* was therefore deficient "because the trial judge did not perform the third step of the *Batson* analysis." *Id.* at 844 (¶9). Miles argued that the correct remedy for this deficiency was to reverse his convictions. *See Hardison v. State*, 94 So. 3d 1092, 1102 (¶34) (Miss. 2012) (reversing conviction after finding a strike was not harmless error when the juror "actually sits on the panel that convicts the defendant"); *Watts v. State*, 281 So. 3d 873, 879 (¶16) (Miss. Ct. App. 2019) (reversing conviction when trial court failed to consider pretext in *Batson* analysis). Although the Mississippi Supreme Court agreed that the analysis was deficient, it determined that the proper remedy was to remand the case for the circuit court to conduct a hearing to adequately perform all three prongs of the *Batson* analysis. *See H.A.S.*, 232 So. 3d at 125 (¶27); *Manning v. State*, 735 So. 2d 323, 341 (¶34) (Miss. 1999) (failure to conduct *Batson* hearing at trial resulted in remand for a *Batson* hearing).

¶21.    Here, Bogan argues that after the defense stated its race-neutral reasons for its peremptory strikes, the trial court failed to have the challenging party, here the State, rebut the race-neutral reasons for the strikes. The trial court did not acknowledge that the reasons

8

for the strikes were race-neutral. Generally, "[u]nless a discriminatory intent is inherent in the [striking party's] explanation, the reason offered will be deemed race neutral." *Randall v. State*, 716 So. 2d 584, 588 (¶16) (Miss. 1998) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)). Further, if a "party offers a valid race-neutral reason, the trial judge *must allow* the strike unless the *other* party demonstrates that the valid race-neutral reason was a pretext for discrimination." *Hardison*, 94 So. 3d at 1100 (¶28) (emphasis added). Our Supreme "Court previously has accepted race-neutral reasons including 'age, demeanor, marital status, single with children, prosecutor distrusted juror, educational background, employment history, criminal record, young and single, friend charged with crime, unemployed with no roots in community, posture and demeanor indicated juror was hostile to being in court, juror was late, [and] short term employment.'" *Miles*, 346 So. 3d at 842 (¶4) (quoting *Hardison*, 94 So. 3d at 1099 (¶23)).

¶22. We agree with Bogan that the inadequate *Batson* analysis warrants a remand for a limited hearing pursuant to *Miles*. The current record does not support a finding of pretext. Discriminatory intent was not "inherent" in the race-neutral reasons offered by the defense. *See Randall*, 716 So. 2d at 588 (¶16). Further, the current record does not support indicia of pretext such as disparate treatment of jurors of the opposite race who were similarly situated to the struck jurors. "It is well established that a *Batson* violation may be shown by disparate treatment of white and minority jurors—that is, if a 'side-by-side comparison[] of some black [potential jurors] who were struck and white ones who were not' shows that the only material distinction between the removed black and the retained white individuals is their race."

9

*Brown v. State*, 306 So. 3d 719, 744 (¶100) (Miss. 2020) (quoting *United States v. Atkins*, 843 F.3d 625, 631 (6th Cir. 2016)); *see Flowers v. State*, 947 So. 2d 910, 929 (¶46) (Miss. 2007) (purported race-neutral reason "highly suspect" when strike not applied to similar juror of opposite race).[2] This principle applies equally in a "reverse-*Batson*" analysis.

¶23.    The *Miles* opinion provided the following guideline for the procedure of the *Batson* hearing, citing with approval to *H.A.S.* in which a similar hearing was ordered:

> [W]e remand this case for the limited purpose of allowing the trial court to conduct a hearing to separate and complete the second and third steps of the *Batson* analysis for Jurors 23, 32, and 35. On remand, should the court move beyond step two, the State should be allowed "the opportunity to prove

---

[2] This absence of an analysis of pretext indicates the necessity for remand. The State and the dissent suggest that we follow the outcome of *Smith v. State*, 387 So. 3d 994, 998 (¶10) (Miss. 2024), and affirm without remanding for a *Batson* hearing. *Smith*, which repeatedly cites favorably to *Miles* and does not purport it should be overruled, is significantly distinguishable. *Id.* at 998-1000 (¶¶12, 13, 20). In *Smith*, nine of ten white potential jurors were peremptorily struck by the defense. *Id.* at 996 (¶3). Of particular prominence in the *Smith* trial record was the disparate treatment of similarly situated jurors of the opposite race. *Id.* When the defense said that a young juror's occupation as a welder (in a case heavy on medical details) was the race-neutral reason for the strike, the State rebutted that the defense had not struck an even younger black juror who worked in a kitchen; the court disallowed the strike. *Id.* The court restored another struck juror to the venire when defense counsel gave an inherently discriminatory reason for the strike, stating that the juror "is a cattle farmer . . . white male. My client is a black male, I don't think there's a whole lot of consideration for my client." *Id.* at 997 (¶5). Further, when age was cited as the reason for striking other jurors, the court disallowed the strike when similarly aged black jurors had been accepted. *Id.* at (¶7). The defense counsel even stated, "I'll confess that one." *Id.* When the trial court's lack of analysis on pretext was raised on appeal, the Mississippi Supreme Court pointed to the pattern of inherent discriminatory intent and disparate treatment to conclude that "[w]ith such a clear pattern of race-based strikes present *in the record*, we hold that the trial court's ruling finds more than sufficient support in the record." *Id.* at 1000 (¶22) (emphasis added). The opinion acknowledged that "[m]any matters of record that come before the Court are not straightforward and clear, but the instant one truly is." But here, unlike *Smith*, the record does not contain the indicia of pretext that was present in *Smith*. Unlike *Smith*, we lack "sufficient support in the record" to be "fully capable [on appeal] of balancing the *Batson* factors . . . ." *Id.* at 999 (¶17).

purposeful discrimination." [*H.A.S.*, 232 So. 3d] at 125 (¶27). Further, Miles would then be allowed to defend his previously stated reasons for the strikes. *Id.* However, consistent with *H.A.S.*, he would be "restricted from giving any new, race-neutral reasons to justify the strike." *Id.* In accordance with the precedent in *H.A.S.*, both sides would be "limited to using the record as it existed at the time of the original *Batson* hearing." *Id.*

*Miles*, 346 So. 3d at 846 (¶15). A similar procedure should be followed here on remand. Further, if the trial court "erroneously denied a peremptory strike in this case, a new trial is required" because "challenged individuals served on the jury" that convicted Bogan. *Id.* at (¶17).

## II. Whether the evidence was sufficient to support Bogan's convictions.

¶24. Bogan argues that the evidence was insufficient to support his convictions and that the trial court therefore erred in denying his motion for a directed verdict and subsequent motion for judgment notwithstanding the verdict. "When reviewing a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bradford v. State*, 337 So. 3d 277, 281 (¶13) (Miss. Ct. App. 2022) (internal quotation marks omitted).

¶25. Bogan points to the lack of ballistic evidence showing that Bogan's gun, rather than Smith's gun, was used to kill Harvey. He argues that law enforcement conducted an inadequate investigation of the scene. Because no shell casings or projectiles were recovered, he contends that a ballistic analysis could not be performed to compare the bullets shot to the gun recovered from Bogan's possession. Or, he suggests, the reason no shell casings were

recovered could be that the gun used was a revolver, and the gun recovered from Bogan was not a revolver.

¶26. The State argues that it did not have to prove that Bogan shot the bullet that killed Harvey. Even if Smith were the shooter, Bogan aided and abetted Smith, making him as guilty as the principal. The court granted the State's aiding and abetting instruction, which stated:

> The guilt of a defendant in a criminal case may be established without proof that the defendant personally committed each individual act constituting the offense alleged. The law recognizes that anything a person can do for himself may also be accomplished by that person acting in concert with another person in a joint effort.
>
> If the defendant joins another person and performs acts with the intent to commit a crime, then the law holds each defendant responsible for the acts and conduct of his accomplice just as if the defendant had committed each act himself.
>
> Before any defendant may be held criminally responsible for the actions of another, however. It is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to commit the crime.
>
> Mere presence at the scene of the crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime. Thus, you may find the defendant guilty only if you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed and that the defendant voluntarily participated in its commission with the intent to violate the law.

¶27. "One who aids and abets another in the commission of a crime is guilty as a principal." *Hughes v. State*, 983 So. 2d 270, 276 (¶14) (Miss. 2008). Our Supreme Court has held:

> Aiding and abetting is defined to be the offense committed by those persons

12

who, although not the direct perpetrators of a crime, are yet present at its commission, doing some act to render aid to the actual perpetrator. . . . And such aiding and abetting may be manifested by acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of the crime, or even by being present, with the intention of giving assistance, if necessary, though such assistance may not be called into requisition.

*Lynch v. State*, 877 So. 2d 1254, 1279 (¶79) (Miss. 2004) (quoting *Swinford v. State*, 653 So. 2d 912, 915 (Miss. 1995)); *see also Chambers v. State*, 412 So. 3d 1223, 1234 (¶36) (Miss. Ct. App. 2025).

¶28.    We agree that the State submitted sufficient evidence of Bogan's participation in the crimes. Bogan was not merely present. Not only did he and Smith initiate a hostile encounter with Harvey and Lattimore, but both Bogan and Smith continued to chase Harvey and Lattimore down the street *after* shots were initially fired by either Smith or Bogan. Both Smith and Bogan had guns. Moreover, Bogan's right hand tested positive for the presence of gunshot residue. The evidence is sufficient to support Bogan's convictions of first-degree murder and aggravated assault.

## CONCLUSION

¶29.    The evidence was sufficient to support Bogan's convictions of first-degree murder and aggravated assault. However, the case must be remanded for a limited hearing in light of the trial court's failure to adequately conduct a *Batson* analysis.

¶30.    **AFFIRMED IN PART; REMANDED IN PART.**

**BARNES, C.J., WILSON, P.J., McDONALD, McCARTY AND EMFINGER, JJ., CONCUR. LASSITTER ST. PÉ, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.  WEDDLE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**

13

**LAWRENCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., WEDDLE AND LASSITTER ST. PÉ, JJ.**

**LAWRENCE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶31. I respectfully dissent in part from the majority opinion because I think the record is sufficient to allow this Court to affirm the trial court's decisions as to the *Batson* objections instead of remanding for a limited *Batson* hearing. *See* Maj. Op. at (¶¶18-23).[3]

¶32. As correctly stated by the majority opinion, the supreme court has articulated three steps involved in a *Batson* analysis:

> First, the party objecting to the use of a peremptory strike has the burden to make a prima facie case that race was the criterion for the strike. Second, if the objecting party makes such a showing, the burden shifts to the striking party to state a race-neutral reason for the strike. **Third, after the striking party offers its race-neutral explanation, the court must determine if the objecting party met its burden to prove purposeful discrimination in the exercise of the peremptory strike—that the stated reason for the strike was merely a pretext for discrimination.**

*Smith v. State (Smith I)*, 398 So. 3d 875, 882 (¶11) (Miss. Ct. App. 2023) (emphasis added), *aff'd*, 387 So. 3d 994 (Miss. 2024) (quoting *Miles v. State*, 346 So. 3d 840, 842 (¶4) (Miss. 2002)); *see also Batson v. Kentucky*, 476 U.S. 79, 98 (1986). Further relevant to this case, the Mississippi Supreme Court has repeated that "the United States Supreme Court [did] not articulate a particular[] means of accomplishing the third step." *Smith v. State (Smith II)*, 387 So. 3d 994, 998 (¶12) (Miss. 2024) (quotation mark omitted) (quoting *Pruitt v. State*, 986 So. 2d 940, 946 (¶20) (Miss. 2008)). But our caselaw demonstrates that "a trial court may

---

[3] I agree with the majority's resolution of all other issues and concur in those parts of the opinion.

express its *Batson* ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a *Batson* challenge." *Smith I*, 398 So. 3d at 887 (¶23) (citing *Pettus v. State*, 295 So. 3d 993, 999 (¶20) (Miss. Ct. App. 2020)).

¶33.    The majority reasons that the trial court failed to have the State "rebut the race-neutral reasons" for Bogan's strikes, and thus, the court's *Batson* analysis was "inadequate" and "warrants a remand for a limited hearing[.]"  Maj. Op. at (¶¶20-22).  I disagree.  While the State may not have articulated its exact reasoning beyond the fact that four white members of the venire were being struck, the trial court certainly found legally impermissible pretextual reasons for the defense strikes.  We are to give "great deference" to the court's findings.  *See Moore v. State*, 914 So. 2d 185, 189 (Miss. Ct. App. 2005) (quoting *Coleman v. State*, 697 So. 2d 777, 785 (Miss. 1997)).  And "[i]n the *Batson* context, the term 'great deference' has been defined as meaning an insulation from appellate reversal of any trial findings which are not clearly erroneous."  *Id.* (citing *Lockett v. State*, 517 So. 2d 1346, 1349-50 (Miss. 1987)).

¶34.    In this case, the State raised a reverse-*Batson* challenge as to Jurors numbered 4, 6, 13, 24, and 32, arguing:

> The defendant was tendered five potential jurors that are white[.] . . . Out of those five individuals that were tendered to the defense, they struck four, leaving only one. And those were the five -- only five were tendered, and the defense struck four.

The judge found a prima facie case for discrimination had been made and instructed Bogan to provide race-neutral reasons for the strikes at issue.  Those reasons were articulated, and the court made a ruling as to each.  To demonstrate the point made in this partial dissent, it

is necessary to quickly review what was stated as to each juror during the trial:

### Juror No. 4

**THE DEFENSE:**    Your Honor -- your Honor, as to Juror No. Juror No. 4, D-1, when I was well, when both attorneys were voir diring, this gentleman did not appear to be engaged at all, and so that was the reason why I exercised D-1 for him.

. . . .

**THE COURT:**    Juror No. 4 did not appear not to be engaged. He listened to the questions. He responded, I presume like the rest of the jurors, when there was something that he wanted to respond to, what he felt applied to him. Juror No. 4 is put on the jury. He will be added to the jury.

### Juror No. 6

**THE DEFENSE:**    As to D-2, your Honor, Juror No. 6 indicated that, I believe, his -- what he characterized as his ex-wife had a prior criminal history. He indicated that -- well, he did indicate that he didn't think that his wife had been treated unfairly, but I got the impression that he may have almost been happy that his wife got prosecuted. And so because of that, I had a concern as to whether or not he would be more -- would tend to lean more favorable to the State as opposed to being fair and impartial.

. . . .

**THE COURT:**    The Court will give you D-2, which was Juror No. 6. I won't add them.

### Juror No. 13

This juror was not struck by the defense.

### Juror No. 24

**THE DEFENSE:**    Juror No. 24 didn't appear to be responsive to either the Court, the State, nor defense counsel; so he just appeared

|  |  |
|---|---|
|  | -- that juror just appeared to be withdrawn from the process. |
| . . . . | |
| **THE COURT:** | Okay. Considering those reasons collectively for each of the strikes as to Juror No. 4, D-1, did not appear to be engaged; Juror No. 6 appeared to be happy that his wife was prosecuted; D-3, Juror No. 24 didn't appear to be responsive, appeared withdrawn from the process; and D-5, appeared that the relationship may have been a little bit more than what was communicated with the Court between Juror No. 4 and Juror No. 32 -- the Court does not find those reasons to be -- I think they are pretextual. . . . D-3 is added to the jury. |

**Juror No. 32**

|  |  |
|---|---|
| **THE DEFENSE:** | Juror No. 32 and Juror No. 4, they work together. Juror No. 4 was the first strike that I exercised. I got the impression that their relationship may have been a little bit more than what was communicated to the Court, and because they did indicate that they work together, that is why I exercised D-5 as it relates to Ms. Norwood. |
| . . . . | |
| **THE COURT:** | . . . D-5, appeared that the relationship may have been a little bit more than what was communicated with the Court between Juror No. 4 and Juror No. 32 -- the Court does not find those reasons to be -- I think they are pretextual. . . . And D-5 is added to the jury. |

Bogan's attorney provided an explanation for each strike at issue, and the court repeated the defense's representation before making its ruling as to each strike. As demonstrated, the trial judge went through each race-neutral reason given and made findings on the record. The judge did not reject all of Bogan's strikes, further suggesting that each reason was considered individually. Furthermore, "[a]ny determination made by a trial judge under *Batson* is

accorded great deference because it is based, in a large part, on credibility." *Moore*, 914 So. 2d at 189 (quoting *Coleman*, 697 So. 2d at 785). The trial court observed the attorneys and their demeanor firsthand, as well as the venire as a whole. This Court cannot do either. The law recognizes the trial court's proximity to the action and places credibility resolutions upon it since it is in acute observation of the heat of battle in the adversarial trial process. *See id.*

¶35. In *Smith II*, 387 So. 3d at 998 (¶12), the Mississippi Supreme Court was faced with the same question before this Court in this case: when a step in the *Batson* process is not clearly shown in the record, should the appellate court remand for a limited *Batson* hearing or, if possible, balance the information readily available from the record and decide the issue in the direct appeal? The *Smith* court stated that "trial court judges should make on-the-record factual determinations of race-neutral reasons in cases involving *Batson* challenges." *Smith II*, 387 So. 3d at 999 (¶17) (quoting *Pruitt*, 986 So. 2d at 946 (¶21)). It should be stated that skipping steps in the *Batson* process should never occur and presents difficulties on appeal that could easily be avoided by following the three-step process. However, the supreme court stated that when the record is sufficient, "we are fully capable of balancing the *Batson* factors in cases such as this one." *Id.* (quotation mark omitted) (quoting *Pruitt*, 986 So. 2d at 946-47 (¶21)). The court repeated the reasoning for such a holding that "continued remand of such cases only **wastes the trial court's limited resources** and **acts to further delay justice**." *Id.* (emphasis added). I believe that remanding Bogan's case would do precisely that.

¶36. On remand, why would the State articulate anything for the record other than exactly

18

what the trial court already stated and found during the first trial that is already in the record?

Further, on remand, I suspect that the trial court will again find exactly what it previously found. We know clearly from the record the basis for the trial court's determination of pretextual strikes. Essentially, the same record already before us will come back here in an appeal after remand. We may then find—based on essentially the same record—the strikes were indeed pretextual. This could be handled now, in this appeal, instead of taking up the trial court's time by engaging in this appellate-court-mandated fact-finding folly. Pursuant to *Smith I* and *II*, I would decide the issue of *Batson* now, in this direct appeal, rather than remand for a hearing, which will only produce for this appellate court the same information already before us.[4] Accordingly, I respectfully dissent in part.

**CARLTON, P.J., WEDDLE AND LASSITTER ST. PÉ, JJ., JOIN THIS OPINION.**

---

[4] I do not find fault with the law relied on by the majority or the result reached under that law. Appellate precedent on *Batson* law is somewhat inconsistent and at times hard to reconcile. The majority and I reach different conclusions by relying on precedent that is still good law and not reversed. I just believe the record is sufficient in accordance with the supreme court's *Smith* decision to address the issue directly in this appeal without the need for remand. The majority, relying on other cases, found the opposite. The two possible results demonstrate a need for higher appellate court clarification.